STATE OF NORTH CAROLINA v. MARVIN RAY SPARROW, KATHERINE TAFT SPARROW, AND BRITTON OXIDINE, JR.

No. 15

(Filed 13 May 1970)

**1. Courts § 7— guilty plea in district court — appeal — trial de novo in superior court**

Upon appeal from the district court, a defendant is entitled to a trial *de novo* in the superior court even though he pleaded guilty in the district court.

**2. Courts § 7— appeal from district court to superior court**

When an appeal of right is taken to the superior court, in contemplation of law it is as if the case had been brought there originally and there had been no previous trial, the judgment appealed from being completely annulled and not thereafter available for any purpose.

**3. Criminal Law § 138— appeal from district court to superior court — increased sentence**

Upon appeal from the district court for a trial *de novo* in the superior court, imposition of a more severe sentence by the superior court judge than that imposed by the district court judge does not violate defendant's right to due process or rights secured by the Sixth Amendment to the U. S. Constitution.

**4. Infants § 7— contributing to delinquency of minor — constitutionality of statute**

The statute, [former] G.S. 110-39, now G.S. 14-316.1, making it a misdemeanor to contribute to the delinquency of a minor is not unconstitutional for vagueness.

**5. Indictment and Warrant § 9— indictment for statutory offense — sufficiency**

Ordinarily, an indictment for a statutory offense is sufficient if the offense is charged in the words of the statute.

**6. Indictment and Warrant § 9— charge of crime**

An indictment must allege all the essential elements of the offense with sufficient certainty so as to (1) identify the offense, (2) protect the accused from being twice put in jeopardy for the same offense, (3) enable the accused to prepare for trial, and (4) support judgment upon conviction or plea.

**7. Infants § 7— contributing to delinquency of minor — sufficiency of warrant**

Warrant is sufficient to charge defendant with a violation of [former] G.S. 110-39, now G.S. 14-316.1, where it alleges that defendant contributed to the delinquency of a named fourteen year old female in violation of G.S. 110-39 by harboring and providing lodging for said minor and wilfully concealing her from officers knowing they had petitions for her arrest for delinquency, runaway and truancy.

**8. Infants § 7— contributing to delinquency of minor — necessity for prior adjudication of delinquency**

It is not necessary that a minor be convicted of the charges contained in a juvenile petition before a person may be prosecuted under G.S. 110-39 for contributing to the delinquency of the minor. G.S. 110-39(b).

**9. Criminal Law § 98— sequestration of witnesses — discretion of court**

Although it is the general rule in this State in both civil and criminal cases to separate witnesses and send them out of hearing of the court when requested, this is discretionary with the trial judge and may not be claimed as a matter of right.

**10. Criminal Law § 98— denial of motion to sequester witnesses**

In this prosecution for contributing to the delinquency of a minor and for interfering with an officer in the performance of his duties, the trial judge did not abuse his discretion in the denial of defendants' motion to sequester the State's witnesses, the record having disclosed no reason for sequestration of the witnesses.

**11. Arrest and Bail § 5— entry of private home without invitation or permission — necessity for demand and refusal of entry**

Absent special or emergency circumstances, a police officer may not lawfully enter a private home without invitation or permission to make an arrest or otherwise seize a person unless he first gives notice of his authority and purpose and makes a demand for and is refused entry.

**12. Arrest and Bail § 6— resisting arrest — illegal entry by officers**

One who resists an illegal entry into a private home is not resisting an officer in the discharge of his duties.

**13. Arrest and Bail § 5— right to break into house to arrest felon — necessity for demand and denial of entry**

Even where there is reasonable ground to believe that a person guilty of a felony is concealed in a house, there exists no right under G.S. 15-44, in the absence of special and emergency circumstances, to break into the house and arrest the person unless and until admittance has been demanded and denied.

**14. Arrest and Bail § 6— obstructing a police officer — instructions — lawful or unlawful entry by officer — rights of defendants**

In this prosecution for obstructing a police officer in the performance of his duties when the officer attempted to serve a juvenile arrest order on a minor who was in a house rented by defendants, the trial court erred in failing to instruct the jury with regard to the rights of defendants if the jury should find that entry by the officers into the house was illegal, where the evidence for the State and for defendants was conflicting as to whether the officers lawfully entered the house, the State's evidence tending to show that entry was made after the officers knocked on the front door and received an invitation to come in, and defendants' evidence tending to show that the officers entered from the front and back of the house without knocking, declaring their identity, authority and mission, and without receiving an invitation to come in.

**15. Arrest and Bail § 6— obstructing police officer named in indictment — instructions — obstructing a different officer**

Where defendant was charged with obstructing a named police officer while the officer was attempting to serve a juvenile petition, the trial court erred in instructing the jury that it could return a verdict of guilty if it found from the evidence beyond a reasonable doubt that defendant obstructed another officer while he was attempting to serve the juvenile petition.

**16. Arrest and Bail § 6— obstructing officer in arrest of juvenile — action after juvenile was in custody — variance between warrant and proof**

In this prosecution under a warrant charging that defendant obstructed a police officer in the performance of his duties by kicking the officer while he attempted to arrest a minor under a juvenile petition, there was a material variance between the warrant and the proof where all the evidence tended to show that when defendant kicked the officer, the officer had already served the juvenile process on the minor and had her in his custody, that another officer had arrested defendant's husband for interfering with the first officer, and that defendant's action was caused by resentment because of her husband's arrest.

**17. Arrest and Bail § 6; Infants § 7— obstructing a police officer— contributing to delinquency of minor — sufficiency of evidence**

The trial court properly denied motion of one defendant for nonsuit of a charge of obstructing a police officer in the performance of his duties and motion of a second defendant for nonsuit of a charge of contributing to the delinquency of a minor.

**18. Criminal Law § 102— argument of solicitor — part of trial**

The argument of the solicitor is part of the trial and not part of the record.

**19. Criminal Law § 170— argument of solicitor — action by trial court — harmless error**

Ordinarily, improper argument of counsel is cured by the court's action promptly sustaining an objection thereto and cautioning the jury not to consider it.

**20. Criminal Law §§ 102, 154— record on appeal — argument of solicitor**

It is not required that the argument of counsel be recorded and included in the record on appeal.

**21. Criminal Law §§ 102, 165, 170— refusal of motion to have solicitor's jury argument recorded**

In this prosecution for contributing to the delinquency of a minor and for interfering with a police officer in the performance of his duties, the trial court did not err in refusing to have the solicitor's argument to the jury recorded, defendants having neither alleged nor shown that any part of the solicitor's argument was improper or prejudicial.

LAKE, J., concurring in result as to Katherine Sparrow.

· BOBBITT, C.J., dissenting as to Oxidine.

SHARP, J., joins in dissenting opinion.

APPEAL by defendants under G.S. 7A-30(1) from decision of the Court of Appeals reported in 7 N.C. App. 107, 171 S.E. 2d 321.

On 7 May 1969 Marvin Ray Sparrow (Marvin) was tried and convicted in Mecklenburg District Court upon two warrants charging him with the following offenses: (1) Contributing to the delinquency of Karen Torpey, a minor, in violation of G.S. 110-39 (now G.S. 14-316.1), and (2) resisting, delaying and obstructing a public officer in the discharge of his duties in violation of G.S. 14-223. The cases were consolidated for judgment, and Marvin was sentenced to six months in jail, suspended for five years on condition he be of good behavior and pay a $50 fine and $15 costs.

On 7 May 1969 Katherine Taft Sparrow (Katherine) was tried and convicted in Mecklenburg District Court upon three warrants charging her with the following offenses: (1) Contributing to the delinquency of Karen Torpey, a minor, in violation of G.S. 110-39, (2) resisting, delaying and obstructing a public officer in the discharge of his duties, and (3) assaulting an officer. On the charges contained in (1) and (2), consolidated for judgment, she was sentenced to six months in jail, suspended for five years on condition she be of good behavior. On the charge of assaulting an officer she was sentenced to thirty days in Mecklenburg County jail.

On 7 May 1969 Britton Oxidine, Jr., was tried and convicted in Mecklenburg District Court upon a warrant charging him with contributing to the delinquency of Karen Torpey, a minor, in violation of G.S. 110-39. He was sentenced to a term of six months in the Mecklenburg County jail.

Defendants appealed to Mecklenburg Superior Court from the judgments pronounced. There the cases were consolidated and tried *de novo* before Mintz, J., and a jury, at the 12 May 1969 Schedule "A" Regular Session.

The State's evidence tends to show that about five weeks prior to their arrest on 5 May 1969, Marvin (age 23) and his wife Katherine (age 21) rented a large two-story house in the city of Charlotte. Twenty to twenty-five people of both sexes lived in the house with them, some on a permanent basis and others temporarily. The rules of the house required permanent residents to contribute to the

payment of rent, purchase of food, and to take part in housekeeping duties. House furnishings included kitchen appliances and one table but consisted primarily of two beds and mattresses sufficient to provide pads for about twenty-five people. It was necessary for a visitor to be at least sixteen years of age and have permission from at least five permanent residents in order to stay overnight. Persons under sixteen years of age, however, had been allowed on occasions to spend the night there.

The State's evidence further shows that on Thursday morning, 1 May 1969, Karen Torpey, a fifteen-year-old girl, went to the Sparrow house without her mother's knowledge or permission. She remained there throughout the day and slept that night in an upstairs room with other persons. She spent Friday night of the same week in the social room of a dormitory in Chapel Hill with a group including Oxidine. They returned to Charlotte Saturday morning, and that night Karen and Oxidine shared a bedroom at the home of one of his relatives. They returned to the Sparrow house on Sunday but went back to his relative's home for several hours between 3 a.m. and 6 a.m. on Monday.

When Karen failed to return from school at the regular time on Thursday afternoon, her mother began an unsuccessful search for her. On the following day, which was Friday, May 2, the mother reported her daughter missing to the Charlotte police and visited the Sparrow house twice searching for her. She talked with defendant Oxidine on both occasions and informed him her daughter was only fifteen years of age. Oxidine told her Karen had been there but fled through the back door when she saw her mother approaching. Karen later testified that she was hiding in an upstairs closet during one of her mother's visits to the Sparrow house.

Clyde White, a State's witness, testified that he saw Karen at the Sparrow house on a mattress with Oxidine in an upstairs room on Sunday evening at which time she offered him beer which she was drinking; that in the early hours of Monday morning while police officers were on the premises looking for Karen, she and Oxidine left the house and Oxidine asked him to let him know when the officers left; that Karen and Oxidine returned when the officers had gone, and shortly thereafter he, White, called the police and informed them Karen was in the house.

On Monday morning, 5 May 1969, Karen's mother filed a petition in the district court in which she alleged that her daughter was uncontrollable, absent from home without permission, and requested the court to assume custody. District Judge Beacham signed a ju-

venile custody endorsement and, armed with this document, Officer Maness of the Charlotte Police Department went to the Sparrow house to serve the document on Karen and take her into custody. He was unable to find her but later, as a result of a telephone call, returned to the Sparrow house accompanied by Lieutenant Hall, Sergeant Griffin, Officer Williams, two uniformed officers, and Clyde White. Officers Hall, Griffin, and Maness went to the front door and the other officers went to the back door. Officer Maness testified that as he knocked on the front door he could see the other officers, who had entered through the back door, already inside the house; however, Lieutenant Hall indicated that he did not see the other officers inside until after he had gained entrance. In response to Officer Maness's knock on the front door, someone inside said "come in." Officers Maness and Hall entered the front door, identified themselves to Marvin Sparrow, and advised him they had court orders to pick up Karen Torpey. Maness began reading the court order aloud, but the entry of the officers created such upheaval among the occupants of the house that he was unable to finish. When Officer Maness asked Karen to come with him, she attempted to run out the front door. Officer Maness caught her around the waist, whereupon Karen bit him on the hand and Marvin jumped on the officer's back. When Lieutenant Hall took hold of Marvin and told him he was under arrest, Katherine attempted to free her husband and kicked Lieutenant Hall. She was then arrested for obstructing and assaulting an officer. Oxidine was also arrested at the scene and charged with contributing to the delinquency of a minor. Throughout this entire confrontation there was pushing and shoving by many, if not all, of the twenty-five people gathered in the "living" room.

Evidence for the defendants tends to show that Lieutenant Hall and Officer Maness entered the front door of the Sparrow house without knocking and without an invitation, and that the other officers entered through the back door before Hall and Maness had gained entrance at the front.

At the close of all the evidence Judge Mintz dismissed as of nonsuit the charge of assault on an officer against Katherine Sparrow. The jury returned a verdict of guilty against all defendants on the remaining charges.

Marvin Ray Sparrow received concurrent sentences as follows: (1) Fifteen to eighteen months in prison for contributing to the delinquency of a minor, and (2) eight to twelve months for obstructing a public officer in the discharge of his duties.

Katherine Taft Sparrow received concurrent sentences as follows:

(1) Nine months for contributing to the delinquency of a minor, and (2) six months for obstructing a public officer in the discharge of his duties.

Britton Oxidine, Jr., was sentenced to prison for a term of eighteen to twenty-one months.

Defendants appealed to the Court of Appeals. That court reversed the convictions of Marvin Ray Sparrow and Katherine Taft Sparrow on the charges of contributing to the delinquency of a minor but upheld the conviction and sentence of each of them on the charge of obstructing a public officer in the discharge of his duties. The conviction and sentence of Britton Oxidine, Jr., on the charge of contributing to the delinquency of a minor was also upheld.

Defendants appealed to this Court under the provisions of G.S. 7A-30(1) assigning numerous errors.

*Attorney General Robert Morgan and Staff Attorney Burley B. Mitchell, Jr., for the State.*

*Casey & Daly by George S. Daly, Jr., and Chambers, Stein, Ferguson & Lanning by Adam Stein for defendant appellants.*

*Of Counsel: Taft, Stettinius & Hollister, Cincinnati, Ohio, by Thomas Allman for defendant appellants.*

MOORE, J.

[3]    Each defendant received a greater sentence in the Superior Court than had been imposed by the district court. Appellants contend that this increase in sentence denied them due process of law and violated rights secured to them by the Sixth Amendment to the United States Constitution. "Until recently, it was the general rule that a trial de novo meant a sentence de novo." *State v. Stafford,* 274 N.C. 519, 531, 164 S.E. 2d 371, 379. Defendants insist that the rule stated in *Stafford,* and supported by voluminous authority, was overruled by the decision in *North Carolina v. Pearce,* 395 U.S. 711, 89 S. Ct. 2072, 23 L. ed 2d 656 (1969).

In *Pearce,* defendant was convicted at the May Term 1961 of Durham Superior Court of assault with intent to commit rape and sentenced to prison for a term of twelve to fifteen years. In 1965 he initiated a post conviction hearing which resulted in a reversal of his conviction by this Court for the wrongful admission of an involuntary confession. *State v. Pearce,* 266 N.C. 234, 145 S.E. 2d 918. He was retried before another Superior Court judge and jury, and again convicted. The trial judge at the second trial imposed a sen-

tence of eight years in prison which, when added to the time already
served, amounted to a longer prison sentence than the 12-year min-
imum originally imposed. The second conviction and sentence were
upheld by this Court, 268 N.C. 707, 151 S.E. 2d 571. Pearce then
instituted habeas corpus proceedings in the United States District
Court for the Eastern District of North Carolina. That court held
the more severe sentence unconstitutional and void and ordered his
release upon failure of the State court to resentence him within sixty·
days. This order was affirmed by the Fourth Circuit Court of Ap-
peals. (397 F. 2d 253). The United States Supreme Court granted
*certiorari* and in affirming the lower court stated:

> "Due process of law, then, requires that vindictiveness against
> a defendant for having successfully attacked his first conviction
> must play no part in the sentence he receives after a new trial.
> And since the fear of such vindictiveness may unconstitutionally
> deter a defendant's exercise of the right to appeal or collaterally
> attack his first conviction, due process also requires that a de-
> fendant be freed of apprehension of such a retaliatory motiva-
> tion on the part of the sentencing judge.

> "In order to assure the absence of such a motivation, we have
> concluded that whenever a judge imposes a more severe sentence
> upon a defendant after a new trial, the reasons for his doing so
> must affirmatively appear. Those reasons must be based upon
> objective information concerning identifiable conduct on the
> part of the defendant occurring after the time of the original
> sentencing proceeding. And the factual data upon which the
> increased sentence is based must be made part of the record, so
> that the constitutional legitimacy of the increased sentence may
> be fully reviewed on appeal."

We hold that *Pearce* is factually distinguishable from the instant
case and has no application here. The following language from *State
v. Morris*, 275 N.C. 50, 61, 165 S.E. 2d 245, 252, is in point:

> "The fact that defendant received a greater sentence in the
> superior court than he received in the Recorder's Court of
> Thomasville is no violation of his constitutional or statutory
> rights. Upon appeal from an inferior court for a trial *de novo*
> in the superior court, the superior court may impose punishment
> in excess of that imposed in the inferior court provided the pun-
> ishment imposed does not exceed the statutory maximum. *State
> v. Tolley*, 271 N.C. 459, 156 S.E. 2d 858 (1967)."

[1, 2]   In *Pearce*, the superior court had original jurisdiction. Here,
its jurisdiction is derivative. In *Pearce*, the same court that imposed

the first sentence imposed the second. Not so here. In *Pearce*, the first conviction was voided on constitutional grounds. Here, defendants simply appealed as a matter of right from an inferior trial court to a superior trial court where they were tried *de novo* pursuant to G.S. 7A-288 (now G.S. 7A-290) and G.S. 15-177.1. In *Pearce,* appellant was required to attack the validity of his conviction and sentence in the trial court and seek reversal for constitutional errors committed there. Here, an appeal entitled these defendants to a trial *de novo* in the Superior Court as a matter of right. This is true even when an accused pleads guilty in the inferior court. *State v. Broome,* 269 N.C. 661, 153 S.E. 2d 384; *State v. Meadows,* 234 N.C. 657, 68 S.E. 2d 406. When an appeal of right is taken to the Superior Court, in contemplation of law it is as if the case had been brought there originally and there had been no previous trial. The judgment appealed from is completely annulled and is not thereafter available for any purpose. *State v. Goff,* 205 N.C. 545, 172 S.E. 407; *State v. Meadows, supra; Spriggs v. North Carolina,* 243 F. Supp. 57 (M.D.N.C. 1965); *Doss v. North Carolina,* 252 F. Supp. 298 (M.D.N.C. 1966). In *Pearce* the defendant was given a new trial on his appeal from an incorrect ruling which was adverse to him. The court's error necessitated the appeal. Under those facts the imposition of additional punishment would in effect have penalized him for asking the court to correct its error. This distinction is emphasized in *Lemieux v. Robbins,* 414 F. 2d 353 (1st Cir. 1969), cert. den. 397 U.S. 1017, 90 S. Ct. 1247, 25 L. ed. 2d 432, which approves the North Carolina rule. In that case the defendant on an appeal from the district court to the Superior Court in the State of Maine, as in North Carolina, was entitled to a trial *de novo.* On his conviction in the Superior Court he was given a greater sentence than that imposed in the district court. The Circuit Court of Appeals for the First Circuit said:

"... Nor, unlike the situation in Pearce, need he demonstrate error, constitutional or other, in a first trial to secure a second trial, which very proof of error gives the state the opportunity to increase the punishment. Such is indeed a one way street. Here we deal with a two way street. Defendant has the benefit of two full opportunities for acquittal. If he fails to gain acquittal in the district court, his mere exercise of his right to 'appeal' not only gives him a new trial but vacates the judgment and removes the entire case to the Superior Court. The state is willing to accept this in the long-run interest of reducing the load on the Superior Court. The defendant need not accept it at all."

It is our view, and we so hold, the decision in *Pearce* is not fashioned to apply to judgments pronounced on appeal from inferior tribunals.

The composition and operation of the Superior Court and the district court emphasize the validity of these distinctions between *Pearce* and the case before us. A district court makes no transcript of the evidence in the trial of a criminal case. It is therefore impossible for a Superior Court judge, upon appeal from a district court, to know what evidence and what facts affected the imposition of sentence in the court below. Furthermore, in a criminal trial before a jury in Superior Court more evidence is ordinarily presented and a more extensive cross-examination is conducted. Thus the facts are more fully developed. The Superior Court judge is generally a lawyer with extensive trial experience and with a deep understanding with respect to proper punishment. It is essential to the proper administration of justice that he use his own independent judgment, based upon the facts as they appear in the trial before him, in imposing punishment; otherwise, trial in the Superior Court becomes a travesty upon justice and a waste of time.

[3]   To hold that upon appeal the Superior Court judge may decrease the sentence imposed below but is precluded from increasing it would necessarily destroy the district court system of this State. With all to gain and nothing to lose, defendants would swamp the Superior Court with appeals in every case and render trials in the district court a vain and worthless exercise. On the other hand, it could tempt district court judges to impose maximum sentences which likewise would prompt every defendant to give automatic notice of appeal. Inasmuch as the trial in the Superior Court is without regard to the proceedings in the district court, the judge of the Superior Court is necessarily required to enter his own independent judgment. His sentence may be lighter or heavier than that imposed by the inferior court, provided, of course, it does not exceed the maximum punishment which the inferior court could have imposed. Such is the rule in North Carolina. *State v. Meadows, supra* (234 N.C. 657, 68 S.E. 2d 406). There is no sensible alternative and, in our opinion, there is nothing in *Pearce* which requires us to hold otherwise. It should also be noted that *Pearce* was decided 23 June 1969, and the sentences in the present case were imposed on 29 May 1969. This assignment of error is overruled.

[4]   Defendant Oxidine was convicted of contributing to the delinquency of a minor. He contends the statute under which he was charged is "so sweeping and vague" as to deny him due process guaranteed by the Fourteenth Amendment. The challenged statute

is G.S. 110-39 (now G.S. 14-316.1 by virtue of Session Laws 1969, Chapter 911, Section 4), which provides in pertinent part that any person "who knowingly or willfully is responsible for, or who encourages, aids, causes, or connives at, or who knowingly or willfully does any act to produce, promote, or contribute to, any condition of delinquency or neglect of [a] child shall be guilty of a misdemeanor."

There is nothing so sweeping and vague about this statute as to confuse men of common intelligence. The words used in G.S. 110-39 are ordinary words in common usage, and adequate warning is provided those inclined to violate them. Simply stated, any person who knowingly does any act to produce, promote or contribute to any condition of delinquency of a child is in violation of the statute.

Huskins, J., speaking for the Court in *In re Burrus,* 275 N.C. 517, 169 S.E. 2d 879, concerning Chapter 110, Article 2 of the General Statutes, which delineates the practices and procedures to be followed in juvenile cases and includes G.S. 110-39, stated:

"It is settled law that a statute may be void for vagueness and uncertainty. 'A statute which either forbids or requires the doing of an act in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application violates the first essential of due process of law.' 16 Am. Jur. 2d, Constitutional Law § 552; *Cramp v. Board of Public Instruction,* 368 U.S. 278, 7 L. ed 2d 285, 82 S. Ct. 275; *State v. Hales,* 256 N.C. 27, 122 S.E. 2d 768. Even so, impossible standards of statutory clarity are not required by the constitution. When the language of a statute provides an adequate warning as to the conduct it condemns and prescribes boundaries sufficiently distinct for judges and juries to interpret and administer it uniformly, constitutional requirements are fully met. *United States v. Petrillo,* 332 U.S. 1, 91 L. ed 1877, 67 S. Ct. 1538."

We think Oxidine could comprehend without difficulty what conduct is prohibited by the statute he challenges for vagueness. Judges and juries have been able to interpret and apply our juvenile statutes uniformly in numerous cases including *In re Burrus, supra; State v. Wiggins,* 272 N.C. 147, 158 S.E. 2d 37, cert. den. 390 U.S. 1028, 88 S. Ct. 1418, 20 L. ed 2d 285; *Winner v. Brice,* 212 N.C. 294, 193 S.E. 400; *In re Coston,* 187 N.C. 509, 122 S.E. 183; *In re Hamilton,* 182 N.C. 44, 108 S.E. 385; *State v. Coble,* 181 N.C. 554, 107 S.E. 132; *State v. Burnett,* 179 N.C. 735, 102 S.E. 711. Furthermore, North Carolina follows the rule that statutes will not be declared

unconstitutional unless they are clearly so. *Hobbs v. Moore County*, 267 N.C. 665, 149 S.E. 2d 1; *State v. Warren*, 252 N.C. 690, 114 S.E. 2d 660. This assignment of error is overruled.

[5-8]  Defendant Oxidine further contends that conceding the constitutionality of G.S. 110-39 the warrant in this case failed to charge a violation of this statute. The warrant in pertinent part reads as follows: "[I]n the county named above and on or about the 4 day of May, 1969, the defendant named above did unlawfully, wilfully, contribute to the delinquency of Karen Torpey, white female, age 14, in violation of G.S. 110-39 of North Carolina by harboring and providing lodging for Karen Torpey and wilfully concealing said minor from officers knowing they had petitions for said Karen Torpey for delinquency, runaway and truancy." G.S. 15-153 provides that every criminal proceeding by warrant is sufficient for all intents and purposes if it expresses the charge against the defendant in plain, intelligible, and explicit manner. Since the enactment of this statute, it has been liberally construed. *State v. Greer*, 238 N.C. 325, 77 S.E. 2d 917. Ordinarily, an indictment for a statutory offense is sufficient if the offense is charged in the words of the statute. *State v. Jackson*, 218 N.C. 373, 11 S.E. 2d 149. In the case of *State v. Greer, supra*, Parker, J. (later C.J.), speaking for the Court, outlined the requirement for a valid indictment and stated the necessity for a lucid and accurate allegation of all the essential elements of the offense as follows:

". . . (1)  such certainty in the statement of the accusation as will identify the offense with which the accused is sought to be charged; (2) to protect the accused from being twice put in jeopardy for the same offense; (3) to enable the accused to prepare for trial, and (4) to enable the court, on conviction or plea of *nolo contendere* or guilty to pronounce sentence according to the rights of the case. *S. v. Cole*, 202 N.C. 592, 163 S.E. 594; *S. v. Gregory*, 223 N.C. 415, 27 S.E. 2d 140; *S. v. Morgan*, 226 N.C. 414, 38 S.E. 2d 166; *S. v. Miller*, 231 N.C. 419, 57 S.E. 2d 392; *S. v. Gibbs*, 234 N.C. 259, 66 S.E. 2d 883."

The *Greer* case was quoted with approval in *State v. Hord*, 264 N.C. 149, 141 S.E. 2d 241. The warrant for Oxidine in this case followed the wording of the statute, cited the statute by number, and made it more definite and explicit by adding the words: "[H]arboring and providing lodging for Karen Torpey and wilfully concealing said minor from officers knowing they had petitions for said Karen Torpey for delinquency, runaway and truancy." This wording is sufficient to put Oxidine on notice that Karen had been charged in a juvenile

petition with delinquency, runaway, and truancy, and that he was charged with contributing to such condition. It was not necessary that Karen be convicted of these charges contained in the petition before proceeding against the defendant under G.S. 110-39, since G.S. 110-39(b) specifically provides that it is not necessary "that there shall have been a prior adjudication of delinquency or neglect of the child to proceed under this statute." Thus, Oxidine was on notice that Karen Torpey was only 15 years of age, had run away from home, and was charged with being a truant and a delinquent, and that he was charged with contributing to such condition by concealing her from her mother and from the officers, by sharing a bedroom with her, and by other acts on his part. It would tax credulity to believe that this defendant, a man 23 years of age, failed to understand that his conduct was unlawful and was contributing to Karen's delinquency knowing as he did that the officers were looking for her to bring her under the protection of the juvenile authorities and to return her to her mother. While the allegations in the warrant could have been more precise, they are sufficient to identify the offense with which the defendant is charged, to protect him from double jeopardy, to enable him to prepare for trial, and to allow the court upon conviction to pronounce sentence. *State v. Greer, supra; State v. Hord, supra.* This assignment of error is overruled.

[9, 10]   Defendants urge that the trial court erred in summarily denying their motion to sequester the State's witnesses. It is the general rule in North Carolina in both civil and criminal cases to separate witnesses and send them out of hearing of the court when requested, but this is discretionary with the trial judge and may not be claimed as a matter of right. *State v. Love,* 269 N.C. 691, 153 S.E. 2d 381; *State v. Spencer,* 239 N.C. 604, 80 S.E. 2d 670; *State v. Manuel,* 64 N.C. 601; Stansbury, N. C. Evidence § 20 (2d Ed. 1963). A judge's refusal to sequester the State's witnesses is not reviewable unless an abuse of discretion is shown. *State v. Barrow,* 276 N.C. 381, 172 S.E. 2d 512; *State v. Clayton,* 272 N.C. 377, 158 S.E. 2d 557. The record discloses no reason for sequestration of the witnesses, and no abuse of discretion has been shown. This assignment of error has no merit and is overruled.

[14]   Defendants' next assignment of error is that the entry into the Sparrow house was illegal and as a consequence they had the right to resist unlawful conduct of an officer; that is, an attempted illegal arrest. The juvenile order for the arrest of Karen seems valid on its face, and if the entry and presence of officers in the Sparrow home were legal, the arrest of Karen under this warrant would constitute conduct of the officers in performance of their duty, and in-

terference would be a violation of G.S. 14-223. Marvin's and Katherine's right to interfere depends upon whether the officers were in the Sparrow home pursuant to a legal entry. Decisions of this Court recognize the right to resist illegal conduct of an officer. *State v. Curtis,* 2 N.C. 471; *State v. Mobley,* 240 N.C. 476, 83 S.E. 2d 100; *State v. McGowan,* 243 N.C. 431, 90 S.E. 2d 703.

**[11-13]**    Ordinarily, a police officer, absent invitation or permission, may not enter a private home to make an arrest or otherwise seize a person unless he first gives notice of his authority and purpose and makes a demand for and is refused entry. Without special or emergency circumstances, an entry by an officer which does not comply with these requirements is illegal. Officers have no duty to make an illegal entry into a person's home. Hence, one who resists an illegal entry is not resisting an officer in the discharge of the duties of his office. *State v. Cesero,* 146 Conn. 375, 151 A. 2d 338 (1959); *King v. State,* 246 Miss. 86, 149 So. 2d 482 (1963); *People v. Young,* 100 Ill. App. 2d 20, 241 N.E. 2d 587 (1968). These views are in accordance with the ancient rules of the common law and are predicated on the constitutional principle that a person's home is his castle. Semayne's Case, 77 Eng. Rep. 194, 195, 11 English Ruling Cases 628, 631 (1604); Cooley, Constitutional Limitations 364 (6th Ed. 1890); *State v. Covington,* 273 N.C. 690, 698, 161 S.E. 2d 140, 146; *State v. Mooring,* 115 N.C. 709, 20 S.E. 182. In North Carolina, under G.S. 15-44, even where there is reasonable ground to believe that a person guilty of a felony is concealed in a house, there exists no right, in the absence of special and emergency circumstances, to break into the house and arrest the person unless and until admittance has been demanded and denied. *State v. Covington, supra.* In *Covington* the opinion states: "With five armed officers present, Covington's opportunity for escape was minimal . . . . Compliance with this requirement [demanding admittance] serves to identify the official status of those seeking admittance. The requirement is for the protection of the officers as well as for the protection of the occupant and the recognition of his constitutional rights."

In the present case, the State's evidence discloses that five other police officers accompanied Officer Maness when he went to the Sparrow residence to arrest Karen. Three officers (Maness, Hall, and Griffin), in plain clothes, approached the front door; and three unidentified officers (two in uniform) went to the back door. Karen's opportunity for escape "was minimal," and there was no evidence of any special or emergency circumstances justifying the waiver of legal requirements to gain entrance.

**[14]** The crucial question then is whether the officers entered the Sparrow home legally. If, as Maness testified, entry was made after the officers knocked on the front door and received an invitation to come in, their entry and presence were legal. If, as the evidence for the Sparrows tended to show, the officers entered, both from the front and from the back, without knocking, without declaring their identity, authority and mission, and without receiving an invitation to come in, their entry and presence were illegal.

The court's instructions did not submit this factual controversy for determination by the jury. There were no instructions bearing upon the rights of the Sparrows if the entry by the officers was illegal. In charging the jury in respect to Marvin's case, the court gave this mandate:

> "[I]f the State has satisfied you . . . beyond a reasonable doubt that on or about the 5th day of May, 1969 . . . the defendant Marvin Ray Sparrow did resist, delay or obstruct an officer, to wit, Mr. Maness, D. M. Maness, in the performance of a duty, that he, Mr. Maness, or Officer Maness, was on a duty, that is, a police duty, and that that duty constituted the service of a process on Karen Torpey, and that he was obstructed or delayed or resisted from carrying out this duty by the defendant Marvin Ray Sparrow, then it would be your duty to find Marvin Ray Sparrow guilty on this charge of resisting, as it's been characterized, interfering with an officer in the performance of his duty."

Thus, the court's instructions ignored the crucial question, whether the entry by the officers was legal or illegal. The jury should have been instructed as to the rights of Marvin if the entry was illegal. Error in this respect was prejudicial and sufficient to entitle Marvin to a new trial.

**[15]** Error also appears as to Katherine. She was tried on a warrant which charged that she "did unlawfully, wilfully, resist, delay and obstruct a public officer, to wit: *Lt. J. R. Hall,* an officer of the Charlotte Police Department youth bureau, while he, the said Lt. J. R. Hall, was attempting to discharge and was discharging a duty of his office, to wit: Serving a petition on a minor, by kicking him from behind as he attempted to arrest a juvenile on the petition, in violation of North Carolina G.S. 14-223 of North Carolina." (Emphasis ours.)

The judge instructed the jury to return a verdict of guilty if they found from the evidence beyond a reasonable doubt that Katherine on 5 May 1969 did "delay and obstruct *Mr. Maness* of the Char-

lotte Police Department while he was attempting to discharge a duty, that is the service of a process on Karen Torpey." (Emphasis ours.) This was obviously error as Katherine was charged with interfering with Lieutenant J. R. Hall and not Mr. Maness.

[16]   However, there is a more serious defect as to Katherine; that is, a material variance between the allegation in the warrant and the proof. All the evidence tends to show that Officer Maness had served the juvenile process on Karen and had her in his custody and that Officer Hall had arrested Marvin for resisting Officer Maness. It was then that Katherine kicked Officer Hall. Her action apparently was caused by resentment because of her husband's arrest, not to prevent Hall from arresting Karen as charged in the warrant since Karen had already been arrested and was in the custody of Officer Maness. Because of this fatal variance between the allegation and proof, Katherine's motion for judgment as in case of nonsuit should have been allowed. State v. Overman, 257 N.C. 464, 468, 125 S.E. 2d 920, 924; 2 Strong's N. C. Index 2d, Criminal Law § 107.

[17]   Marvin and Oxidine assign as error the trial court's refusal to grant their motions for judgment as of nonsuit. The State's evidence tended to show all the elements of the crimes charged, and the denial of these motions was correct. State v. Overman, 269 N.C. 453, 153 S.E. 2d 44; State v. Beaver, 266 N.C. 115, 145 S.E. 2d 330; State v. Mullinax, 263 N.C. 512, 139 S.E. 2d 639.

[18-21]   The defendants also assign as error the refusal of the trial court to have the solicitor's argument recorded, contending that such refusal violated their rights of appeal. The argument of the solicitor is part of the trial and not part of the record. It was defendant's duty to object to any part of the argument deemed improper so as to secure a ruling from the court then and there. The record does not show any objections to the remarks of the solicitor or that any exceptions were taken to any rulings of the court on such objections. Ordinarily, improper argument of counsel is held cured by the court's action promptly sustaining the objection to the argument and cautioning the jury not to consider it. 7 Strong's N. C. Index 2d, Trial, § 11, p. 274. The Supreme Court of North Carolina has in the interest of justice set stringent requirements for the record on appeal. These rules do not include the requirement that the argument of counsel be recorded and included in the record on appeal. 1 Strong's N. C. Index 2d, Appeal and Error, §§ 40, 41, 42. Since the appellants have neither alleged nor shown that any part of the solicitor's argument was improper or prejudicial, this assignment of error is without merit.

Other assignments of error have been carefully considered but, in view of the conclusions reached, deserve no further discussion.

For the reasons stated above, we hold as to Katherine Sparrow, the judgment of the Court of Appeals is reversed; as to Marvin Sparrow, we find error and remand for a new trial; and as to Britton Oxidine, the decision of the Court of Appeals upholding the judgment of the trial court is affirmed.

As to Katherine Sparrow: Reversed.

As to Marvin Sparrow: New trial.

As to Britton Oxidine: Affirmed.

LAKE, J., concurring in result as to Katherine Sparrow.

Katherine Sparrow was charged with: (1) Unlawfully and wilfully resisting, delaying and obstructing "Lt. J. R. Hall, an officer of the Charlotte Police Department youth bureau, while he * * * was attempting to discharge a duty of his office, to-wit: Serving a petition on a minor, by kicking him from behind as he attempted to arrest a juvenile on the petition;" and (2) "assault on Lt. J. R. Hall * * * by striking the said Lt. J. R. Hall, with her feet as she kicked him from behind."

The superior court dismissed the second charge. The effect is an adjudication that she did not commit the assault which is the basis of the first charge — resisting, obstructing and delaying the officer. Since the second charge has been so adjudicated, it necessarily follows that the motion for nonsuit on the charge of resisting, obstructing and delaying the officer should have been granted. Consequently, I concur in this result.

I cannot, however, concur in the reasoning by which the majority has reached this result and which, I fear, will rise up to haunt us in other cases of resistance to police officers. The majority says the nonsuit should have been granted because at the time Katherine Sparrow kicked Lt. Hall, Karen had already been arrested and was in the custody of Officer Maness.

The evidence for the State is that Karen Torpey, the child whom the process directed the officers to take into custody, attempted to dart past the officers and run out of the front door of the Sparrow house. Officer Maness grabbed her by the arm. She then bit him. As he was in process of gaining control over the child and of removing her from the house, Marvin Ray Sparrow sprang upon Officer Maness' back, obviously to prevent him from taking Karen from the house.

As they struggled, Lt. Hall laid hold upon Marvin Ray Sparrow and told him he was under arrest. When he did so, Katherine Sparrow kicked Lt. Hall.

If we disregard the trial judge's adjudication that Katherine Sparrow did not assault Lt. Hall, we have here, in my opinion, a clear-cut case of resisting and obstructing the officer in the discharge of his duty to serve the petition upon Karen Torpey. Obviously, Lt. Hall and Officer Maness were collaborating. I cannot agree with the suggestion that simply because a police officer has a grasp upon a person, for whose arrest he has a valid process, and has told such person he or she is under arrest, the arrest is so far complete that, while the officer is struggling to subdue the prisoner and remove him or her from the scene of arrest, another person may strike the officer, in the course of the general melee, without being guilty of resisting and obstructing a police officer in the discharge of his duty in violation of G.S. 14-223.

I concur in the majority opinion as to the defendants Oxidine and Marvin Ray Sparrow.

BOBBITT, C.J., dissenting as to Oxidine.

The warrant charges that Oxidine wilfully contributed to the delinquency of Karen by harboring and providing lodging for her and wilfully concealing her from officers when he knew that "they (the officers) had petitions for said Karen Torpey for delinquency, runaway and truancy." The warrant does not charge that Karen was delinquent in any respect. The only accusation is that officers had petitions which charged her with "delinquency, runaway and truancy."

It is unnecessary, as expressly provided in Subsection (b) of G.S. 110-39, "that there shall have been a prior adjudication of delinquency or neglect of the child in order to proceed under this statute." This simply means that an adjudication of delinquency *in an independent proceeding for that purpose* is not a prerequisite to a prosecution under the statute.

In my opinion, in a prosecution under G.S. 110-39, it is incumbent upon the State *to allege* and *to prove* that the named child is a delinquent in respect of some particular condition of delinquency and that the accused wilfully contributed to the child's delinquency in that respect.

Applying these well-established legal principles, the warrant does not sufficiently charge a violation of G.S. 110-39. Hence, this Court, *ex mero motu*, should arrest the judgment. *State v. Walker*, 249 N.C.

35, 38, 105 S.E. 2d 101, 104. The arrest of judgment on the ground the warrant is fatally defective would not bar further prosecution on a valid warrant. *State v. Sossamon*, 259 N.C. 374, 130 S.E. 2d 638.

While I would base decision on the insufficiency of the warrant, the following should be noted.

The only reference to the verdict in the record is the recital in the judgment that defendant had been "found guilty of the offense of Cont/Del/Minor which is a violation of N.C. G.S. 110-39 and of the grade of Misdemeanor . . ." Assuming the verdict was returned by the jury as stated in the quoted recital, the significance thereof must be determined by reference to the allegations, the facts in evidence, and the instructions of the court. *State v. Thompson*, 257 N.C. 452, 457, 126 S.E. 2d 58, 61. "(T)he verdict should be taken in connection with the issue being tried, the evidence, and the charge of the court." *Davis v. State*, 273 N.C. 533, 539, 160 S.E. 2d 697, 702.

In charging the jury, the court's final instruction (mandate) was as follows: "Now, when you come to consider the case of Britton Oxidine, Jr., if the State has satisfied you and satisfied you beyond a reasonable doubt that on or about May 4, 1969, that Karen Torpey was a delinquent minor; that is, under the age of sixteen, *as 'delinquency' and 'minor' have been explained to you*, and that on or about that date he aided, encouraged or contributed in harboring or concealing her and that harboring or concealment amounted to a furtherance of her delinquency, if the State has so satisfied you of these elements then it would be your duty to find him guilty." (My italics.)

Earlier in the charge the court had defined "delinquency" in the following three sentences: " 'Delinquency' means failure, omission, violation of duty, or it may be the state or condition of one who has failed to perform his duty. A delinquent child is an infant of not more than specified age who has violated the law or who is incorrigible. 'Incorrigible' with respect to juvenile offenders means unmanageable by parents or guardians."

Under the foregoing circumstances, the meaning and significance of the verdict are at best imprecise.

I do not defend or condone the activities or conduct of Oxidine as disclosed by the record before us. Nor do I suggest that the evidence is insufficient to have supported a verdict of guilty in an error-free trial on a sufficient warrant. However, I regard firm adherence to sound legal principles as to criminal pleading of greater importance than the effect this decision will have upon Oxidine.

SHARP, J., joins in this dissenting opinion.