STATE OF NORTH CAROLINA v. HOWARD MACK MILLER

No. 7226SC173

(Filed 30 August 1972)

1. Constitutional Law § 4; Searches and Seizures § 1— gambing house employee — standing to object to search

An employee of a gambling house who was in charge of the premises when a search was made had standing to invoke the protection of the Fourth Amendment against an unlawful search of the premises.

2. Searches and Seizures § 3— affidavit relating to gambling — warrant to search for intoxicating liquor — invalidity of warrant

Although a police officer's affidavit would have been sufficient to support a finding of probable cause for issuing a warrant authorizing the search of a house for gambling equipment, it was insufficient to support a finding of probable cause as contained in the warrant actually issued authorizing a search of the house for intoxicating liquor.

3. Searches and Seizures § 3— issuance of warrant — probable cause — duty of magistrate

By simply signing without reading the warrant which a police officer placed before him, a magistrate failed to perform his judicial function of making his own independent determination from the affidavit submitted to him as to whether probable cause existed for issuance of the warrant which he signed.

4. Criminal Law § 84; Searches and Seizures § 1— statutory exclusionary rule — applicable to all trials

The exclusionary rule provided by G.S. 15-27(a) applies in any trial, not just in a trial for the offense by reason of which the illegal search was initially undertaken.

5. Searches and Seizures § 1— observation of gambling — illegal entry on premises

Fact that officers could observe gambling after passing through two doors of a house and opening a third door did not give them

State v. Miller

authority to enter and seize the gambling apparatus in use where they arrived at the position to observe the gambling while purporting to act under an invalid search warrant and under circumstances in which a valid warrant was required.

**6. Arrest and Bail § 3; Searches and Seizures § 1— observation of misdemeanor — prior illegal entry**

The fact that after police officers passed through two doors of a house and opened a third door the officers could claim to have reasonable ground to believe that a misdemeanor, gambling, was being committed in their presence did not legalize their original entry into the house or justify a further intrusion into the premises for the purpose of making arrests. G.S. 15-41(1).

**7. Criminal Law § 86; Homicide § 15— injuries to defendant by police officers — competency to show bias of officers**

In a prosecution for the murder of a police officer during a police raid on a gambling house, testimony and exhibits with respect to beatings and injuries inflicted by the police upon defendant and other occupants of the premises following the shooting of the officer were competent to show the bias against defendant of officers who testified for the State, and the trial court committed prejudicial error in excluding such evidence.

**8. Homicide § 15— homicide during police raid — testimony concerning other robberies — competency to show apprehension of robbery**

In a prosecution for the murder of a police officer who was shot during a police raid on a gambling house, testimony by defendant, a "house man" employed at the gambling house, concerning information he had received prior to the shooting about robberies of gambling games in the area in recent years was relevant as bearing upon the reasonableness of defendant's apprehension that a robbery might have been in progress when he saw unidentified armed men walking rapidly into the room.

**9. Criminal Law § 73— statements by third parties — competency — hearsay**

In a prosecution for the murder of a police officer during a police raid on a gambling house, defendant's testimony as to information he had received from third parties about robberies of other gambling games was not excludable as hearsay, where the testimony was not offered to prove the truth of the statements made by the third parties but only to show that the statements had been made to defendant.

ON *Certiorari* to review judgment of *McLean, Judge,* 19 April 1971 Special Criminal Session of Superior Court held in MECKLENBURG County.

Defendant was indicted for the first-degree murder of R. E. McGraw, a police officer. He pleaded not guilty. The killing occurred at approximately 1:50 a.m. on 17 October 1970 while

McGraw and other officers were raiding a gambling house in Charlotte, N. C. Defendant was a "house man" employed at the gambling house.

The State's evidence in substance showed the following:

About 10:00 p.m. on 16 October 1970 Sergeant B. S. Treadaway of the Vice Control Division of the Charlotte Police Department received information from a confidential informant that gambling was then taking place at 1322 East Fourth Street, a house located about three blocks from the Law Enforcement Center. Pursuant to this information he and other officers went to the address between 11:00 p.m. and midnight and obtained the license numbers of cars parked behind the house. On returning to the Law Enforcement Center and checking these license numbers, Sergeant Treadaway identified owners of some of the cars and recognized among them the names of several persons who had a reputation for gambling. He related this information to Officer R. E. McGraw, who typed an affidavit and a search warrant. The affidavit recited that affiant had "reliable information and reasonable cause to believe that Occupants (of the premises at 1322 East Fourth Street) has (sic) on the premises and under their control cards, money, dice and gambling paraphernalia," and set forth the grounds for affiant's belief. The search warrant, which was prepared on a "form-type blank" which bore at the top the heading, "Search Warrant — Intoxicating Liquor Possessed for Purpose of Sale," recited that affiant had "stated under oath that Occupants has (sic) in his possession intoxicating liquor for the purpose of sale, described in the attached affidavit," and directed the officers to search the premises "for the property in question," and "[i]f this intoxicating liquor is found, seize it and all other intoxicating liquor found by you to be possessed there in violation of law, plus all glasses, bottles, jugs, pumps, bars, or other equipment used in the business of selling or manufacturing intoxicating liquor. . . ." Sergeant Treadaway took the affidavit and warrant to the office of J. P. Eatman, Jr., a magistrate, and requested that the search warrant be issued based on the affidavit. Sergeant Treadaway read, signed, and swore to the affidavit in front of the magistrate, but did not read the warrant. The magistrate read the affidavit and "scanned over the search warrant to see if all the blanks were filled," but "did not read completely the search warrant itself." The magistrate asked Treadaway if he was "going out

to round up some gamblers," inquired as to the last time Tread-away had been in touch with his confidential informant, and then signed the warrant without having read it. This occurred at 1:40 a.m. on 17 October 1970 after Treadaway had been in the magistrate's office a total of "two or three minutes." The magistrate knew that Treadaway was "right much in a hurry to get the raid under way." On leaving the magistrate's office Sergeant Treadaway took the affidavit and warrant, folded together but not attached to each other, out to the car and gave them to Officer McGraw, who put them "out of sight," and that was the last time Sergeant Treadaway saw the search warrant.

Sergeant Treadaway and thirteen or fourteen officers from the Charlotte City Police Department and the Mecklenburg County ABC Board, all of whom were in plain clothes, then went to the house at 1322 East Fourth Street, where they arrived about 1:50 a.m. Sergeant Treadaway, Officer McGraw, and six other officers went to the back of the house, while the other officers went to the front and side. The officers found the back door standing open. They did not knock at this door or give any notice of their presence to the occupants of the house. Looking through the open back door into a hallway, the officers saw a second door, which had a one-way glass in the top half. They entered the hallway through the open back door, crouched down to avoid detection, and proceeded to the second door. There was a door bell at the second door, but the officers did not ring the bell or knock at the second door, which was unlocked and ajar. Sergeant Treadaway opened the second door wide enough so that he and the other officers could get through, and then proceeded down the hallway to a third door, which was closed. This door also had a one-way glass in it, which was similar to the glass which was in the second door. The hallway from the outside door to the third door was ap-proximately thirteen feet long. At the third door Sergeant Treadaway stood up and knocked lightly. A man named Mc-Gowan, whom Sergeant Treadaway recalled having arrested for gambling on a previous occasion, opened the door. The door swung outward into the hallway toward Sergeant Tread-away, who caught it and pulled it on back, at which point he was able to see into the room. At that time Officers McGraw, Taylor, Tanner, Smith and Patterson were with Treadaway in the portion of the hallway between the second and third doors.

Other officers were in the portion of the hallway between the first and second doors.

The room into which Sergeant Treadaway looked after the third door was opened was about 36 feet long, facing straight ahead, northward, and about 15 feet wide. In the room Sergeant Treadaway saw two tables. The first, nearest to the door, was a round table about six feet in diameter, at which seven or eight men were seated, holding cards in their hands and with money on the table. Further back and against the north wall of the room was a second, octagon shaped, table with six or seven men around it. Immediately the third door was opened, Sergeant Treadaway walked into the room, followed by the other officers. When he was two or three steps inside the room, he said, "Police, police. Sit down." He proceeded northward walking at a rapid pace down the west side of the room, past the first table, and had almost reached the second table when he heard a shot. Three or four seconds elapsed between the time Sergeant Treadaway entered through the third door until he heard the first shot. A total of four, five or six shots were fired. These were fired in two short bursts, first two or three shots, then a pause, then some more shots, the entire time elapsing during the shooting being between 2.2 and 2.8 seconds. Sergeant Treadaway turned and saw Officer McGraw down on the floor on his knees at the south end of the room in the area of the doorway through which he had just entered. Defendant was standing about eight to ten feet away and in the doorway to a bathroom at the southeast corner of the room. Defendant was holding a blue steel snub-nose revolver in his right hand, held across his chest towards his left shoulder and pointing towards the ceiling. The defendant went into the bathroom. After the shooting Sergeant Treadaway found in the bathroom a blue .38 revolver, similar to the one he had seen in defendant's hand. This revolver had five spent rounds.

McGraw had followed Treadaway into the room, about one or two steps behind him, and Officer Tanner had followed immediately behind McGraw. While Treadaway had walked north down the west wall of the room toward the second table, McGraw and Tanner had turned slightly to their right and moved toward the first table. Tanner was hit by three bullets, but recovered from his wounds. McGraw also received three

bullet wounds, two in his back and one on his right forearm. He died as result of the wounds in his back. Officer Taylor, who followed Officers McGraw and Tanner into the room and who had been in the room one or two seconds when the shooting started, testified that he saw defendant fire at McGraw three times and that the last shot was fired by defendant at Mc-Graw after McGraw had fallen to the floor. When McGraw fell, Taylor stepped up over him and McGraw went on through Taylor's legs. As quickly as he could on hearing the first shot, Taylor started drawing his own pistol, a .38 Smith and Wesson, from the holster which he wore on his right hip. In addition to Taylor, five other officers who were present at the shooting, namely, Treadaway, Smith, Patterson, Russell and Wallace, testified that they were armed with .38 caliber pistols at the time.

An S.B.I. expert in firearms testified that, after making tests, he was of the opinion that a bullet found in McGraw's clothing when he was being undressed in the emergency room at the hospital had been fired from the blue .38 revolver which Sergeant Treadaway had found in the bathroom immediately following the shooting. It was also the opinion of this expert that a bullet which was removed from the shoulder of Officer Tanner and a bullet found in the floor near the west wall had been fired from this same .38 caliber revolver, while a fourth bullet, which was found in the floor right inside the door, had been fired by Officer Smith's gun. The witness had no opinion as to what gun had fired a bullet which was removed from beneath McGraw's right arm or a bullet which was found in the east wall of the room. Sergeant Treadaway testified that when he entered the bathroom after the shooting, his own weapon was still in its holster on his right side, that he had not drawn it, and that to his knowledge no other officers had their guns out.

Defendant's evidence in substance showed the following:

Defendant was on the premises as an employee of one Scruggs, who had rented the house in September and had been operating it for gambling for about three weeks. Defendant's duties were to look after the place, to serve food, coffee, sometimes beer and sometimes whiskey. Defendant had been working at the gambling house for four or five days before the night of

State v. Miller

the shooting. His salary was to be 25% of the week's take after overhead.

Immediately prior to the officers' entrance, defendant had been mopping the floor around one of the tables where five or six men were playing poker. He had just returned the mop to the bathroom adjoining the main room when he heard a noise in the area of the doorway leading from the entrance hall into the main room. "It sounded like somebody kicked the door down." Defendant looked through the open bathroom door into the main room and saw a man heading in a northerly direction. As this man was proceeding north, defendant saw him knock Mr. McGowan to the floor and also knock over a small table which was against the west wall of the room. The man had a pistol in his hand pointed at the table at the north end of the room where men were playing cards. Two other men came within defendant's view. One of these had a pistol. Defendant did not know these men. Up to that point defendant had not heard anything about police being there or about a search warrant. As the men entered the room one of the poker players at the round table started to get up and defendant heard someone say, "Keep your seat, put your hands over your head. Leave the money on the table." Defendant, thinking it was a robbery, pulled his pistol, and hollered, "Hold it." Defendant then saw the intruder at the northern end of the room (whom defendant later learned was Sergeant Treadaway) turn his pistol toward defendant and run in a southern direction. Defendant heard a shot and thought this man had fired. Defendant ducked in the bathroom doorway and then came back up shooting. Defendant fired because he was being shot at and because he thought they were being robbed. To the best of defendant's recollection he fired three times. Defendant then turned around and reentered the bathroom and stood with his pistol pointed at the bathroom door to see if anybody would come through the door. Then someone hollered, "This is the police. Come out of the bathroom with your hands over your head." Defendant dropped his gun and came out with his hands up.

McGowan, called as a witness for defendant, testified that before the officers entered he was preparing to leave the gambling hall. He looked through the two-way mirror in the door and saw no one. He heard no knock or bell and did not

State v. Miller

know anyone was out there. He turned the door knob and it was snatched out of his hand. Some men rushed the door and shoved him backward. Someone coming in the door was carrying a gun. He did not know Treadaway and had never had a conversation with him. He heard no one say they were police when they came inside the room and heard no one say anything with respect to a search warrant. Other occupants of the room also testified that they heard no knock at the door, heard no one say "police" or otherwise make any announcement of identification or purpose, heard no mention of a warrant, and saw no badges or other visible indications identifying the intruders as police officers at any time before the shooting.

The jury found defendant guilty of murder in the second-degree. From judgment imposing prison sentence, defendant appealed. To allow sufficient time for settling the case on appeal, the Court of Appeals granted petition for writ of certiorari.

*Attorney General Robert Morgan by Associate Attorney General Walter E. Ricks III for the State.*

*Sanders, Walker & London by James E. Walker and Arnold M. Stone for defendant appellant.*

PARKER, Judge.

Defendant objected to testimony by the officers concerning what they observed on entering the house where the shooting occurred and moved to suppress any evidence which the officers obtained after entering the building on the grounds that the search warrant was invalid and the entry unlawful. After a *voir dire* examination, the trial judge concluded that the warrant, when interpreted with the affidavit, was sufficient to give the officers "at least color of authority to go upon the premises," that therefore the officers "were upon the premises legally, not as trespassers, and that from observing the gambling in the room or the playing of poker by those located at the first table, that the officers had a right and lawful authority to enter and seize the gambling apparatus in use, that is, the playing cards and the money." Upon these conclusions, the judge denied defendant's motion to suppress and overruled his objections to the testimony of the officers. In this there was error.

State v. Miller

At the outset, it should be observed that we are not here concerned with any question of whether a search warrant, though defective, may nevertheless be sufficient "color of authority" to protect the officers attempting to serve it from civil liability or from a charge of criminal trespass. Our Supreme Court has held that if properly served, an arrest warrant, though defective, may still be sufficient to protect the officers from an action for false arrest, *Alexander v. Lindsey,* 230 N.C. 663, 55 S.E. 2d 470, and this Court has held that police officers armed with process, if they are known to be officers or if they properly identify themselves, may not be lawfully resisted, though the writ be defective or irregular in some respect. *State v. Wright,* 1 N.C. App. 479, 162 S.E. 2d 56. Such questions are not here presented. Rather, we are here concerned with the question whether defendant's Fourth Amendment rights, made available to him by *Mapp v. Ohio,* 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed. 2d 1081, and his statutory rights provided by Chapter 15, Article 4 of the General Statutes of North Carolina, were violated by the trial court's rulings. We hold that they were.

It is elementary that the Fourth Amendment right to be secure against unreasonable searches and seizures "extends to all equally: to those justly accused, as well as to the innocent." *State v. Mills,* 246 N.C. 237, 98 S.E. 2d 329; that an "unlawful search does not become lawful by the discoveries which result from it"; *State v. Hall,* 264 N.C. 559, 142 S.E. 2d 177; and that a search made without a valid search warrant under circumstances requiring a warrant is an unreasonable search within the meaning of the Fourth Amendment. *State v. Vestal,* 278 N.C. 561, 180 S.E. 2d 755.

[1] Defendant in the present case, as the agent of Scruggs, the lessee of the premises, and as a joint venturer with him in operating the gambling establishment thereon, was the person in charge of the premises at the time the search was made. Accordingly, he had sufficient standing to invoke the protection of the Fourth Amendment against an unlawful search of the premises. *Jones v. United States,* 362 U.S. 257, 80 S.Ct. 725, 4 L.Ed. 2d 697; *Commonwealth v. Rossetti,* 349 Mass. 626, 211 N.E. 2d 658.

[2-4] The Fourth Amendment provides that "no warrants shall issue but upon probable cause, supported by oath or affirmation and particularly describing the place to be searched and the

persons or things to be seized." Essentially the same requirement is made by our statutes relating to search warrants. G.S. 15-26 provides in part:

> "(a) The search warrant must describe with reasonable certainty the person, premises, or other place to be searched and the contraband, instrumentality, or evidence for which the search is to be made"; and

> "(b) An affidavit signed under oath or affirmation by the affiant or affiants and indicating the basis for the finding of probable cause must be a part of or attached to the warrant."

The affidavit in the present case would have been sufficient to support a finding of probable cause for issuing a warrant authorizing a search of the premises for gambling equipment. No such warrant was issued and nothing in the affidavit furnished any basis whatever for the finding of probable cause as contained in the warrant which was in fact issued, i.e., a finding of probable cause to believe that the occupants of the premises to be searched possessed thereon intoxicating liquor in violation of law. The record before us makes manifest that the magistrate, by simply signing without reading the paper which the police officer placed before him, utterly failed to perform the important judicial function which it was his duty to perform as a neutral and detached magistrate of making his own independent determination from the affidavit submitted to him as to whether probable cause existed for issuance of the search warrant which he signed. Had he performed his duty, it is inconceivable that the mistake would have occurred. We deal here not with mere clerical error, but with the safeguarding of fundamental constitutional rights which belong to all of us, rights which, in the first instance, it was the magistrate's high duty to defend. He failed to perform that duty. As a result, the search warrant which he signed was not merely technically defective; it was totally invalid since the finding of probable cause which he purported to make was in no way supported by the affidavit or evidence before him.

G.S. 15-27 (a) provides as follows:

> "(a) No evidence obtained or facts discovered by means of an illegal search shall be competent as evidence *in any trial.*" (Emphasis added.)

It should be noted that the language of the statute is broad enough to make the exclusionary rule applicable in any trial, not just in a trial for the offense by reason of which the illegal search was initially undertaken. The trial court's rulings in the present case violated this statutory exclusionary rule. They violated as well the Federal constitutional exclusionary rule announced in *Weeks v. United States*, 232 U.S. 383, 34 S.Ct. 341, 58 L.Ed. 652, and which *Mapp v. Ohio, supra,* made binding upon the States.

[5]    We do not accept the trial judge's reasoning, contained in his order overruling defendant's motion to suppress, that "the officers had a right and lawful authority to enter and seize the gambling apparatus in use," because they could observe gambling in the room after the third door was opened. Such reasoning would tend to wipe out the Fourth Amendment altogether. After all, in almost every case an object will become in plain view once a search reveals its presence, but this fact does not dispense with the need for a valid search warrant if the object came within view of the officers under circumstances otherwise requiring one. The pertinent question in the present case is not what was in plain view of the officers once they were in a position to peer through the opened third doorway. Rather, the pertinent question is as to under what circumstances did the officers arrive at that position. In this case they did so while purporting to act under authority of an invalid search warrant and under circumstances in which a valid warrant was required.

[6]    Similarly, the fact that after the third door was opened the officers could then claim to have reasonable ground to believe that a misdemeanor, gambling, was being committed in their presence did not, in our opinion, serve to legalize their original entry or to justify a further intrusion into the premises for the purpose of making arrests. No contention has been made that the officers had any ground to believe that a felony had been or was about to be committed by any occupant of the room so as to make the provisions of G.S. 15-43 or G.S. 15-44 here applicable. And in our opinion G.S. 15-41(1), which authorizes a peace officer to make an arrest without a warrant for a misdemeanor committed in his presence, was never intended to legalize a warrantless entry upon premises which could not otherwise be lawfully entered except under authority of a valid warrant. The crucial question still remains as to how

the officers got into such position that they could observe a misdemeanor being committed in their presence.

We hold that the trial court committed prejudicial error in denying defendant's motion to suppress and in overruling defendant's objections to testimony by the officers as to what they saw upon entering the premises which was the subject of their search.

In view of our holding, we need not consider whether the search was illegal for the additional reason, urged by defendant, that, quite apart from any question of validity of the search warrant, entrance to the premises was made in an unlawful manner. We do point out, however, that our Supreme Court has cautioned that even though police officers have a valid search or arrest warrant, absent invitation or permission ordinarily they may not enter a private home unless they first give notice of their authority and purpose and make a demand for entry. *State v. Sparrow*, 276 N.C. 499, 173 S.E. 2d 897. "Compliance with this requirement serves to identify the official status of those seeking admittance. The requirement is for the protection of the officers as well as for the protection of the occupant and the recognition of his constitutional rights." *State v. Covington*, 273 N.C. 690, 161 S.E. 2d 140. While the evidence in the present case was conflicting as to whether the officers knocked before entering the third door and as to when and how clearly they announced their identity as police officers, all of the evidence discloses that the officers took precautions to conceal their presence on the premises until after they had passed through two doorways, that they wore no uniforms and displayed no badges of authority, and that they made no announcement of their identity or purpose until after they had stepped inside the room. Sergeant Treadaway, the first officer to enter the room, testified on cross-examination:

> "I knocked lightly on the third door and it opened. . . I stepped back and opened the door around. . . and I walked in at a pretty rapid pace. . . .

> "When I reached a point two or three feet beside of the refrigerator I said we were the police. . . I had taken one or two steps inside the room when I announced we were police. . . . "

\* \* \* \* \*

> "I made no statement regarding a search warrant when I went into the room . . . never mentioned it to anybody . . . never heard anyone else mention it to anybody . . . never heard anyone else mention the words 'search warrant' to anybody."

\* \* \* \* \*

> " . . . We had no warrant to arrest anyone. A search warrant authorizes a search for objects. What we really wanted to do, rather than search for objects, was to catch people in the process of violating the law."

To suppress a misdemeanor, the officers invited a felony. One of their own fell victim. Had they but observed the law themselves, in all probability the tragedy would not have occurred.

[7]　Appellant also assigns error to the trial court's rulings excluding testimony and exhibits with respect to beatings and injuries inflicted by the police upon the defendant and other occupants of the premises following the shooting. Defendant's counsel initially sought to elicit this testimony on cross-examination of the officers who testified as State's witnesses. "Cross-examination of an opposing witness for the purpose of showing his bias or interest is a substantial legal right, which the trial judge can neither abrogate nor abridge to the prejudice of the cross-examining party." *State v. Hart*, 239 N.C. 709, 80 S.E. 2d 901. The excluded evidence was clearly competent to show the bias of the witnesses against the defendant, and the trial court committed prejudicial error in excluding it in this case. *State v. Hart, supra; State v. Sam*, 53 N.C. 150.

[8, 9]　The trial court refused to permit defendant to testify concerning information he had received prior to the shooting as to robberies of gambling games in the Charlotte area in recent years. This testimony was relevant as bearing upon the reasonableness of defendant's apprehension that a robbery might have been in progress when he saw unidentified armed men walking rapidly into the room. While defendant obtained his information as to the robberies of the other gambling games from third parties, his testimony concerning their statements to him was not offered to prove the truth of their statements but only to show that the statements had been made to him. The exclusionary force of the hearsay rule is not applicable when the extrajudicial statement of a third person is not offered to prove the truth of the utterance, but only to show

that the statement was made. In this case the fact that such statements had been made to defendant was independently relevant to defendant's state of mind quite apart from any question of the truth or falsity of the statements. Defendant suffered prejudicial error in the exclusion of this testimony.

Appellant has made other assignments of error, some of which appear to have merit. We do not discuss them, however, since the questions presented may not recur upon a new trial. For the errors noted above, defendant is entitled to a

New trial.

Judges CAMPBELL and MORRIS concur.