STATE OF NORTH CAROLINA v. LARRY DARNELL WILLIAMS

No. 70A81

(Filed 2 June 1982)

**1. Constitutional Law § 63; Jury § 7.12 — excusal of jurors for capital punishment views**

Defendant was not denied his constitutional rights to due process or to trial by jury by the excusal for cause of three veniremen because of their responses to "death qualification" questions where the record shows that the potential jurors each expressed sufficient refusal to follow the law of capital punishment, should it become applicable in the case, to justify their excusal for cause. The fact that one prospective juror's negative responses were phrased as "I'm not sure I could" or "I'm not positive I could" did not equivocate her refusal to follow the law as given by the judge to such an extent as to make the challenge for cause of such juror improper.

**2. Jury § 7.11 — remarks by trial court—burden of death disqualification not placed on defense**

The trial court's remarks to defense counsel during the voir dire examination of prospective jurors that "if you want to try to rehabilitate a juror, you're going to do it. . . . Now, I gave you an opportunity to ask any questions you wanted to ask," did not indicate that the trial court was placing the burden of "death disqualification" on the defense but was merely an admonishment of defense counsel about his duty of effective representation.

**3. Grand Jury § 3; Jury § 5.2 — failure to show discriminatory selection of grand and petit jurors**

The trial court properly denied defendant's motion to dismiss the indictment and to strike the venire of petit jurors on the ground that the grand and petit venires were discriminatorily selected and failed to represent a cross-section of the community where the State and defendant stipulated that names on the grand and petit jury lists were selected from voter registration lists and the property tax lists for the county in accordance with provisions of G.S. Ch. 9 and that there was no evidence of any intentional discrimination upon the grounds of race in preparing these lists, and where defendant's counsel did not investigate other sources from which information as to the racial computation of the master jury panel could be determined.

State v. Williams

4. Constitutional Law § 31— denial of state-funded statistician

The trial court did not err in denying defendant's motion that the court order the State to provide funds to hire a statistician to assist defendant in his challenge to the array of the grand jury and the composition of the petit jury venire where defendant made no showing of a reasonable likelihood that the appointment of a statistician would materially assist him in the preparation or presentation of his contentions.

5. Constitutional Law § 45— no right to act as co-counsel in trial

The trial court did not err in denying defendant's motion to allow him to participate as co-counsel in his trial and to participate in the voir dire hearing.

6. Criminal Law § 135.3; Jury § 7.11— death qualification of jury prior to guilt phase—same jury for penalty phase—constitutionality

The procedure set out in G.S. 15A-2000(a)(2) for death qualifying a jury prior to the guilt phase and the requirement of the statute that the same jury hear both the guilt and penalty phases of the trial are constitutional.

7. Constitutional Law § 74; Criminal Law § 48— evidence of defendant's request for attorney—right to remain silent—right to counsel

An officer's testimony that, during in-custody interrogation after defendant had waived his *Miranda* rights, defendant stated that he didn't rob or kill anybody and he wanted to talk to a lawyer and that there was no more questioning after defendant's request for a lawyer did not violate defendant's right to remain silent and his right to counsel since there was no specific incriminating accusation leveled at the defendant at the time he asserted his rights which defendant, by his silence, might be said to have admitted, and the State did not use defendant's request for an attorney to infer guilt.

8. Criminal Law § 102.8— jury argument—comment on failure to testify—curative instructions

The prosecutor's arguments concerning lack of cross-examination or rebuttal evidence to contradict the State's case did not constitute an improper comment upon defendant's failure to testify. Any impropriety in the prosecutor's argument that the jury had "neither heard by cross-examination or direct evidence on behalf of Mr. Williams that he was not there" was cured when the court immediately sustained defense counsel's objection and instructed the jurors that they should "not consider any reference about Mr. Williams refuting anything," and the court later instructed the jury that defendant's decision not to testify created no presumption against him and was not to influence their decision in any way.

9. Criminal Law § 117.3— instruction on grant of immunity not required—charge reduction for testimony properly before jury

In this prosecution for first degree murder, two accomplices who testified for the State under an agreement that they would plead guilty to accessory after the fact to the murder and receive ten-year sentences to run concurrently with ten-year sentences already imposed for accessory after the fact to a second murder were not granted immunity in this case so as to require the trial court to inform the jury of their immunity pursuant to G.S. 15A-1052. In

State v. Williams

any event, the fact that the two witnesses had made arrangements for charge reductions in exchange for their testimony was clearly before the jury where one witness was cross-examined concerning his arrangement, the State stipulated as to the arrangement with the second witness, defense counsel in his argument to the jury repeatedly reminded the jury of the plea bargains by both witnesses, the State also reminded the jury of the agreements during closing arguments, and the trial court instructed the jury about the plea arrangements during the charge on the duty of the jury to scrutinize the testimony of accomplices.

**10. Criminal Law § 135.4— two felony murders—use of one as aggravating circumstance in trial of other—double jeopardy**

Where the State used a Gaston County robbery-murder of a service station attendant as an aggravating circumstance in the punishment phase of a Cabarrus County trial for the robbery-murder of a convenience store employee pursuant to G.S. 15A-2000(e)(11), the principle of double jeopardy did not preclude (1) the use of the robbery-murder of the convenience store employee in Cabarrus County as an aggravating circumstance in the trial of defendant for the robbery-murder of the service station attendant in Gaston County and (2) the trial of defendant in Gaston County for the robbery-murder of the service station attendant.

**11. Criminal Law § 135.4— sentencing hearing—inadmissibility of evidence of propriety of death penalty**

Evidence offered by defendant regarding the lack of any deterrent effect of the death penalty, the rehabilitative nature of people who have committed even heinous crimes, and the manner of execution in North Carolina was irrelevant and properly excluded in a sentencing hearing in a first degree murder prosecution.

**12. Constitutional Law § 36; Homicide § 31— felony murder—death sentence not cruel and unusual punishment**

Imposition of the death penalty for a felony murder did not constitute cruel and unusual punishment.

**13. Criminal Law § 90— no impeachment by State of own witness**

The State was not permitted to impeach its own witness during the sentencing phase of a robbery-murder trial when it elicited testimony concerning prior inconsistent statements given by the witness to an SBI agent where defendant had attempted to impeach the witness's testimony by proof of prior inconsistent statements to the SBI agent, and the purpose of the testimony was to corroborate the witness's testimony during the guilt phase that he had changed his story about the robbery-murder several times.

**14. Criminal Law § 62— reference to polygraphist—absence of prejudice**

Defendant was not prejudiced by an SBI agent's reference on one occasion to an officer as a "polygraphist" since the jury cannot be deemed to have inferred that a polygraph examination was conducted from the one isolated use of the word "polygraphist."

State v. Williams

15. **Criminal Law § 135.4— aggravating circumstance—course of conduct including other crimes—constitutionality—sufficiency of evidence**

As used in the aggravating circumstance set forth in G.S. 15A-2000(e)(11), that the murder was part of a course of conduct in which the defendant engaged and which included the commission by the defendant of other crimes of violence against another person or persons, the term "course of conduct" is not unconstitutionally vague or indefinite. Furthermore, the evidence was sufficient to permit the jury to find the existence of such aggravating circumstance beyond a reasonable doubt where it tended to show that, after committing the robbery-murder of a service station attendant for which he was on trial, defendant went to a nearby town and committed a robbery-murder of a convenience store employee.

16. **Criminal Law § 135.4— first degree murder—sentencing hearing—mitigating circumstances—plea bargain between State and accomplices**

Evidence of a plea bargain and sentencing agreement between the State and two of defendant's accomplices was irrelevant and properly excluded from the jury's consideration as a specific mitigating circumstance in a sentencing hearing in a first degree murder case, since such evidence had no bearing on defendant's character, record or the nature of his participation in the offense.

17. **Criminal Law § 135.4— first degree murder—sentencing hearing—mitigating circumstances—use of alcohol by defendant**

Evidence that defendant drank some alcohol on the evening of a robbery-murder did not require the trial court to submit to the jury the impaired capacity mitigating circumstance set forth in G.S. 15A-2000(f)(6) where there was no expert psychiatric or other evidence to show that defendant's capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law was impaired. Nor was the trial court required to submit the fact that defendant drank some alcohol for the jury's consideration as a general mitigating circumstance.

18. **Criminal Law § 135.4— capital case—sentencing hearing—mitigating circumstances—burden of proof**

The trial court in a first degree murder prosecution did not err in placing the burden on defendant to prove the mitigating circumstances by a preponderance of the evidence and in failing to require the State to prove the absence of the existence of mitigating circumstances beyond a reasonable doubt.

19. **Criminal Law § 135.4— capital case—aggravating and mitigating circumstances—duty of jury to recommend death sentence**

In a prosecution for first degree murder, it was not error for the prosecutor to argue and the court to instruct the jury that it would be their *duty* to recommend that defendant be sentenced to death if they found beyond a reasonable doubt that the submitted aggravating circumstance existed, that it was substantially sufficient to call for the imposition of the death penalty, and that it outweighed any mitigating circumstance or circumstances found.

**20. Criminal Law § 135.4; Homicide § 31.1.— death penalty for first degree murder not excessive and disproportionate**

Where the evidence showed that defendant deliberately sought out two lone employees of business establishments in relatively isolated areas during the early morning hours when no one was around, robbed them at gunpoint, and then shot them to death at very close range with a shotgun before fleeing with the money, the sentence of death imposed upon defendant for the first of those murders was not excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant.

Justice EXUM dissenting as to sentence.

ON appeal by defendant as a matter of right from the judgment of *Snepp, Judge,* entered at the 18 May 1980 Criminal Session of Superior Court, GASTON County. The defendant was charged in an indictment, proper in form, with the murder of Eric Joines. Defendant pled not guilty, and trial began on 2 June 1980. The jury found the defendant guilty of first-degree murder under the felony murder rule and recommended the sentence of death.[1] From the conviction of murder and the judgment of death imposed thereon, the defendant appealed.

*Rufus L. Edmisten, Attorney General by Thomas F. Moffitt, Assistant Attorney General, and Elizabeth C. Bunting, Assistant Attorney General, for the State.*

*Adam Stein, Appellate Defender, and Ann B. Petersen and James R. Glover, Office of the Appellate Defender, for Defendant-Appellant.*

MEYER, Justice.

This appeal presents forty-seven assignments of error for our review. No meaningful summary statement of the numerous issues presented by these assignments is possible. We have

---

1. The defendant was also found guilty of armed robbery but the judgment of conviction on that charge was arrested. Although not brought forward in the defendant's brief, we note that the indictment purportedly charging him with armed robbery failed to so do because it did not identify the defendant; instead it named Linda Massey as the person charged with armed robbery. *State v. Hammonds,* 241 N.C. 226, 85 S.E. 2d 133 (1954); *State v. Finch,* 218 N.C. 511, 11 S.E. 2d 547 (1940); *State v. McCollum,* 181 N.C. 584, 107 S.E. 309 (1921); *State v. Phelps,* 65 N.C. 450 (1871). This failure has no effect on the murder conviction, however, because when the State prosecutes a defendant for first-degree murder under the felony-murder rule, the solicitor need not secure a separate indictment for the underlying felony. *State v. Carey,* 288 N.C. 254, 218 S.E. 2d 387 (1975).

grouped the assignments essentially as they are in the defendant's brief. Our conclusion is that there was no error in the proceedings below, and the judgment and sentence of death is affirmed.

The evidence at trial showed that during the dark hours of 2-3 June 1979, Eric Joines was working the third shift at Station Number 5 of Service Distributors on Highway 321 North in Gastonia. His duties were selling gas and oil and collecting money. Sidney Sivvoy Kirksey testified that he had seen Mr. Joines after dark at Service Distributors on 2 June, and had telephoned him at the station later from Belmont and heard voices in the background. Herbert William Frye testified that sometime during the early morning hours of 3 June he and Mack Wright stopped at the station to get some gas and found Mr. Joines lying on his stomach in a puddle of blood with part of the back of his head blown away. The police were summoned to the scene and when Officer Wilson of the Gastonia City Police arrived a few minutes later, at about 4:18 a.m., Mr. Joines was still alive, coughing and gagging. Dr. Sivalingam Siva, an expert in neurosurgery, saw Mr. Joines in the emergency room at Gastonia Memorial Hospital. He testified that in his opinion, the wound in the right side of Mr. Joines' neck was caused by a shotgun blast, possibly from a very close range and that the victim died from lack of oxygen to the brain caused by the gunshot wound.

The testimony of two accomplices, cousins of each other, Linda Massey and Darryl Brawley, established that on the evening of 2 June the defendant, the two witnesses, and another male, not positively identified, were together in Charlotte traveling in a car belonging to Robert Brown, another cousin of Linda Massey. The defendant and Brown had traded cars earlier in the day. The defendant had a .20-gauge sawed-off shotgun with him in the car.

During the course of the evening, the group was drinking alcohol, smoking marijuana, and taking Valium. They traveled onto Interstate 85 and left Charlotte. They later got off the interstate at an exit and passed the service station where Eric Joines worked. They came back up the road to the station and stopped there, apparently "casing" the service station. They then traveled down the road in the opposite direction and once again returned to the service station. The unidentified fourth person

and the defendant, with shotgun in hand, went into the booth where Mr. Joines worked and robbed him. The defendant then shot him and they got back into the car with the money from the cash register they had put in a bag.

The defendant chose not to present any evidence during the guilt-innocence phase of the trial. The jury returned a verdict of guilty of first-degree murder under the felony murder rule.

At the sentencing phase, the State presented evidence of only one aggravating circumstance, that the murder of Eric Joines was part of a course of conduct in which the defendant engaged and which included the commission by the defendant of other crimes of violence against another person or persons. G.S. § 15A-2000(e)(11). The evidence showed that after the Joines killing in Gastonia, the defendant and the other three occupants of the car proceeded to Concord and there stopped at a Seven-Eleven convenience store. The defendant and the unidentified male entered the store and the defendant returned to the car, got his shotgun and went back into the store where he fatally shot the clerk, Mrs. Susan Verle Pierce. The two then robbed the store of $67.00 in cash.[2]

The defendant presented evidence that he had cooperated with his attorney in a personal injury action, had voluntarily admitted himself to a drug treatment center, had been gainfully employed and was a good worker, had financially assisted his family members and was a loving family member. He also presented evidence tending to impeach the testimony of Darryl Brawley.

The judge submitted, and the jury found, the existence of the one aggravating circumstance. The judge submitted ten mitigating circumstances and the jury found the existence of seven of them:

A. The defendant has no significant history of prior criminal activity.

Answer: Yes

2. For futher details of this robbery-murder, see *State v. Williams*, 304 N.C. 394, 284 S.E. 2d 437 (1981)—hereinafter "Williams (I)."

State v. Williams

B. The defendant's age at the time of this murder (24 years).

Answer: Yes

C. The defendant was gainfully employed at the time of the murder for which he has been convicted, was a good worker, and had been gainfully employed since he was a teenager.

Answer: Yes

D. The defendant demonstrated a determination to overcome his problems and to try to lead a better life by voluntarily submitting himself for treatment for drug problems in October, 1975 and January and February, 1976.

Answer: Yes

E. Defendants IQ of 69 is a mitigating circumstance.

Answer: No

F. Defendant's conduct in a normal business manner with Attorney Karl Adkins as to a personal injury case is a mitigating circumstance.

Answer: No

G. The defendant has a good character and reputation.

Answer: Yes

H. The defendant is considerate and loving to his mother and sisters.

Answer: Yes

I. The defendant is a considerate and loving father.

Answer: Yes

J. Any other circumstance or circumstances arising from the evidence which you deem to have mitigating value.

Answer: No

The jury found beyond a reasonable doubt that the aggravating circumstance outweighed the mitigating circumstances and recommended that the defendant be sentenced to death. Judgment was entered pursuant to this recommendation.

I. Pretrial Motions And Jury Selection

[1]   The defendant assigns as error (Assignments Nos. 21 and 22) the trial court's excusal for cause of the three veniremen, Robertson, Melton, and Williams. The defendant argues that these three potential jurors were improperly excused for cause and thus the defendant was deprived of his life without due process of law and his right to trial by jury.

This argument concerns the trial court's excusal for cause during *voir dire* of the three veniremen because of their responses to the *Witherspoon v. Illinois*[3] "death qualification" questions.

> The applicable constitutional standard permits the excuse of a potential juror for cause if it is established that he 'would *automatically* vote against the imposition of capital punishment without regard to any evidence that might be developed at the trial of the case . . . .' *Witherspoon v. Illinois*, 391 U.S. 510, 522 at n. 21, 88 S.Ct. 1770, 1777, 20 L.Ed. 2d 776, 785 (1968); *see State v. Cherry*, 298 N.C. 86, 257 S.E. 2d 551 (1979), *cert. denied*, 446 U.S. 941, 100 S.Ct. 2165, 64 L.Ed. 2d 796 (1980).

*State v. Pinch*, 306 N.C. 1, --- S.E. 2d --- (1982). The defendant contends that the three jurors excused for cause on this basis did not unequivocally state that they were so unalterably opposed to the death penalty that they would be unwilling to vote in favor of the death sentence no matter how aggravated the facts and circumstances turned out to be. The record reveals that this contention is without merit, for considering contextually their responses to the questions propounded, the potential jurors expressed sufficient refusal to follow the law of capital punishment, should it become applicable to the case, to justify their excusal for cause. *State v. Pinch*, 306 N.C. 1, --- S.E. 2d ---; *State v. Avery*, 299 N.C. 126, 261 S.E. 2d 803 (1980).

The record reveals that Frances Williams unequivocally stated that she would not impose the death penalty:

Examination By the Court:

.   .   .   .

---

3. 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed. 2d 776 (1968).

State v. Williams

Q. All right. Now, if you answered each of those yes—that you found beyond a reasonable doubt there were aggravating circumstances, you found beyond a reasonable doubt that they were sufficiently substantial to call for the imposition of the death penalty, and you also found that the aggravating circumstances beyond a reasonable doubt outweighed the mitigating circumstances, would you then vote to impose the death penalty?

A. I just don't feel like I could impose the death penalty.

Q. Not even if you were satisfied beyond a reasonable doubt of those things?

A. No I feel life imprisonment.

MR. CLONINGER: Could I ask her one more question?

COURT: (Nods his head.)

EXAMINATION By Mr. Cloninger:

Q. Mrs. Williams, you understand that unless you were convinced beyond a reasonable doubt that the aggravating circumstances were sufficiently substantial to require the death penalty you would not be required to recommend a sentence of death?

A. Um-hum.

Q. All right. Knowing that, again I ask you could you not follow the law that His Honor gives you and apply it and make your own determination based on the law His Honor gives you and the evidence that you'll hear at the sentencing hearing?

A. Well, I understand that, you know, I have to take the evidence into consideration, and I realize that the law with the death penalty—I understand that that is one of the penalties, but I just don't feel the death penalty is right. That's just—

Q. Yes, ma'am. I understand that. I understand your feelings. Do you understand that you would not be required under the law to make a recommendation of the sentence of death unless you yourself were personally satisfied beyond a

reasonable doubt that the aggravating circumstances that the State alleged were sufficiently substantial to justify in your mind a recommendation of a death sentence? Do you understand that?

A. Right. I have to feel that it's—that—that the evidence is all there and that in my mind I feel like that that's—that's what you are trying to tell me, right?

Q. What I'm trying to tell you, I guess, is you understand that you are not required to make a recommendation of a sentence of death unless you are satisfied beyond a reasonable doubt that the aggravating circumstances are so bad—are so substantially—are so sufficiently substantial to require in your mind the imposition of the death sentence? If you are not convinced beyond a reasonable doubt of that in your mind, you are not required to make a recommendation of death. Now, again I ask you could you not do that?

A. I could in my mind think and decide, yes, how I felt.

COURT: Well, Mrs. Williams, if you were satisfied of all those things beyond a reasonable doubt, then would you invoke to impose the death penalty?

A. I just don't feel like that I could.

The same is true of Mrs. Robertson:

EXAMINATION By the Court:

.  .  .  .

Q. If you serve as a juror in this case, could and would you if called upon to do so make a sentence recommendation of life imprisonment or death in accordance with the law of North Carolina as that will be explained to you by the court, or would you be unable to do so regardless of the law and the facts and circumstances and evidence because of your conscientious beliefs as to the proper punishment for first-degree murder?

A. I believe I would be unable to.

Q. You feel that in spite—you could not follow the law—that if—even though the State has satisfied you beyond a

reasonable doubt of the things it is required to so satisfy you under the law that you could not return a recommendation of punishment of death because of your beliefs about that?

A. I believe I could not.

. . . .

EXAMINATION By Mr. Cloninger:

Q. Do you feel if you were selected as a juror that you could consider the death penalty if it became necessary to consider it, that you could discuss it with other jurors, that you could discuss the law, and you could discuss the evidence in the case? You could consider it, couldn't you?

A. I could discuss the evidence, yes. I'm not too sure about discussing the death penalty.

Q. Well, you could discuss it with other jurors, couldn't you?

DISTRICT ATTORNEY: OBJECTION to arguing with the witness.

COURT: Go ahead.

Q. Do you feel like you could discuss it?

A. I'm not sure.

Q. All right, and I ask you — there are some circumstances — some aggravating circumstances which are so serious, so severe that you could consider the death penalty as an appropriate sentence and consider recommending it, couldn't you?

A. No.

Q. Under no circumstances?

A. I don't believe so.

The record concerning Mrs. Melton consists of the following questions by the Court and her answers thereto:

EXAMINATION By the Court:

. . . .

Q. Now, if you serve as a juror in this case, could and would you if called upon to do so make a sentence recommendation

of life imprisonment or death in accordance with the law as it will be explained to you by the court, or would you be unable to do so regardless of the law and the facts and circumstances revealed by the evidence because of some conscientious belief as to the proper punishment for first-degree murder; that is, that you conscientiously feel that it should in all cases be life in prison or you feel in all cases it should be the death penalty?

A. Your Honor, I'm not sure I could say that someone else had to die. I'm not sure I could do that.

Q. Well, it's — this is something we have to determine at this state — whether you if you serve as a juror could follow the law of North Carolina and if you are satisfied beyond a reasonable doubt of those things which the law requires you to be satisfied you could then return a recommendation of the death penalty.

A. I'm not positive I could do that. I've never been called on to do that, and I'm not sure that I could live with my conscience.

Q. Well, do you have conscientious beliefs about the death penalty — religious beliefs about it?

A. Yes.

Q. And you do not feel that you could follow the instructions of the court if you were satisfied beyond a reasonable doubt of the things of which you must be satisfied. If those conclusions would call for the death penalty, you don't feel you could make such a recommendation?

A. I'm not sure that I could.

The fact that her negative responses were phrased as "I'm not sure I could" or "I'm not positive I could" does not equivocate her refusal to follow the law as given by the judge to such an extent as to make the challenge for cause improper. *State v. Avery*, 299 N.C. 126, 261 S.E. 2d 803. It is apparent that Mrs. Melton was "irrevocably committed before the trial [began], to vote against the penalty of death regardless of the facts and circumstances that might emerge in the course of the proceedings." *Davis v. Georgia*, 429 U.S. 122, 50 L.Ed. 2d 339, 97 S.Ct. 399 (1976).

[2] The defendant argues in connection with his Assignments 21 and 22 that the judge suggested that the defendant was obligated to examine the potential jurors about their death penalty feelings. This contention presents a misinterpretation of the judge's remarks. The exchange upon which the contention is based is as follows:

[By the Court:]

Q. Do you wish to ask her any questions?

DISTRICT ATTORNEY: The State would challenge her for cause.

MR. CLONINGER: We don't—I don't wish to ask her any questions, Your Honor.

COURT: All right. The challenge for cause is allowed. Thank you, Mrs. Melton. I'm going to ask you to go up to Courtroom B. Judge Kirby will know whether he needs you for any other case. Okay. Thank you.

MR. CLONINGER: Could we for the record enter an objection to the exclusion of that juror, Mrs. Melton?

COURT: Now, gentlemen, I'm not going to—if you want to try to rehabilitate a juror, you're going to do it. I'm not going to play games. Now, I gave you an opportunity to ask any questions you wanted to ask. What's the next juror's name?

There is no indication that the judge was placing the burden of "death disqualification" on the defense. The judge was merely admonishing defense counsel of his duty of effective representation. By further questioning, the defense possibly could have shown that the potential juror did not actually mean to say that he or she could not return a recommendation of death no matter what the circumstances.

The defendant was not denied his constitutional rights to due process of law or trial by jury by the excusal of these jurors for cause. *State v. Pinch,* --- N.C. ---, --- S.E. 2d ---; *State v. Avery,* 299 N.C. 126, 261 S.E. 2d 803; *State v. Cherry,* 298 N.C. 86, 257 S.E. 2d 551 (1979), *cert. denied,* 446 U.S. 941, 100 S.Ct. 2165, 64 L.Ed. 2d 796 (1980). Assignments of Error Nos. 21 and 22 are overruled.

[3]   The defendant assigns as error (Assignments Nos. 1, 2 and 3) the trial court's failure to dismiss the indictment and to strike the venire of petit jurors on the ground that the grand and petit venires were discriminatorily selected and failed to represent a cross-section of the community. He further assigns as error the trial court's denial of defendant's motion that the court order the State of North Carolina to provide funds to hire a statistician to assist the defendant in his challenge to the array of the grand jury and the composition of the petit jury venire.

In ruling on these motions, the court found that it had been stipulated between the State and the defendant that the compilation of the master jury panel list for Gaston County, from which the members of the grand jury returning the indictments in this case were drawn, and the master panel, from which the venire of the trial jurors had been drawn for the trial in this case, were selected in accordance with the provisions of Chapter 9 of the General Statutes of North Carolina, i.e. from the voter registration lists and the property tax lists for the county. The State and the defendant also stipulated that there was no evidence of any intentional discrimination upon the grounds of race in preparing these lists. The court concluded therefore as a matter of law that the procedure followed was in conformity with the Constitution of the United States and the Constitution of North Carolina. Defendant's counsel did not investigate other sources from which information as to the racial computation of the master jury panel might be determined. Based on these factors, the judge properly denied the defendant's motions to dismiss the indictment. *State v. Cornell*, 281 N.C. 20, 187 S.E. 2d 768 (1972).

[4]   The trial court also properly denied the defendant's motion for a State-funded statistician. Our cases have established the rule that an expert assistant, in this case a statistician, must be provided "only upon a showing by the defendant that there is a reasonable likelihood that it will materially assist the defendant in the preparation of his defense or that without such help it is probable that the defendant will not receive a fair trial." *State v. Gray*, 292 N.C. 270, 279, 233 S.E. 2d 905, 911 (1977); *State v. Tatum*, 291 N.C. 73, 229 S.E. 2d 562 (1976).

The defendant also argued that it was error for the trial court to deny his motion for a court-appointed expert to aid him

in his challenge to the jury compositions in his appeal to this Court of his Cabarrus County murder conviction. *State v. Williams* (I), 304 N.C. 394, 284 S.E. 2d 437 (1981). There, this Court pointed out that the defendant had made no showing of a reasonable likelihood that the appointment of a statistician would have materially assisted him in the preparation or presentation of his contentions and thus overruled the assignment of error. The defendant concedes that he made no stronger showing of a reasonable likelihood that a statistician would be of material assistance in this case than he did in the Cabarrus County case, but asks the court to reconsider its rulings on this issue. We reaffirm our prior rulings, and Assignments of Error Nos. 1, 2 and 3 are overruled.

[5] In Assignment of Error No. 15, the defendant contends that the court erred in denying his motions to allow him to participate as co-counsel in the trial and to participate in *voir dire*. This same argument also was rejected in *Williams* (I). We reaffirm our ruling there:

> Although a criminal defendant cannot be required to accept the services of court-appointed counsel, (citations omitted) we have previously said that a criminal defendant cannot represent himself and, at the same time, accept the services of court-appointed counsel. *State v. House*, 295 N.C. 189, 244 S.E. 2d 654 (1978), answered this very question as follows:
>
> > It is well settled that a defendant in a criminal action has a right to represent himself at the trial and cannot be required to accept the services of court-appointed counsel. (Citations omitted.) It is, however, equally well settled that '[a] party has the right to appear *in propria persona* or by counsel, but this right is alternative,' so that 'one has no right to appear both by himself and by counsel.' (Citations omitted.) Thus, while the defendant elected to retain the services of the court-appointed counsel, the court did not err in holding that the interrogation of prospective jurors and of witnesses must be done through his counsel.

*Id.* at 204, 244 S.E. 2d at 662.

The Court's decision in *House* clearly answers the question posed by this assignment of error adversely to defendant's contention.

Williams (I) at 407, 284 S.E. 2d at 446.

This assignment of error is overruled.

**[6]** The defendant next argues that (Assignments of Error Nos. 7, 16, 17, 18, 19, 20, and 41):

[T]he procedure set out in G.S. § 15A-2000(a)(2) for death qualifying a jury prior to the guilt phase and requiring the same jury to hear both the guilt phase of the trial and the penalty phase of the trial is unconstitutional. It is the defendant's contention that "death qualifying" the jury prior to the guilt phase results in a guilt prone jury; thereby depriving the defendant of his right to a fair trial, a fair sentencing hearing and freedom from cruel and unusual punishment, all guaranteed by the Sixth, Eighth, and Fourteenth Amendments to the United States Constitution. In addition, the defendant contends that the process of 'death qualifying' the jury and excluding for cause those jurors who express opposition to the death penalty deprives the defendant of his rights to equal protection of the laws, a jury chosen from a cross-section of the community and due process of law, all guaranteed by the Sixth and Fourteenth Amendments to the United States Constitution.

As acknowledged by the defendant, this Court has decided these issues against the defendant, and the assignments of error upon which this argument is made are without merit. *State v. Pinch* 306 N.C. 1, --- S.E. 2d ---; *State v. Taylor*, 304 N.C. 249, 283 S.E. 2d 761 (1981); *State v. Avery*, 299 N.C. 126, 261 S.E. 2d 803.

II. GUILT—INNOCENCE PHASE

**[7]** Under Assignments of Error Nos. 33 and 34, the defendant argues that the admission of Officer Rivelle's testimony to the effect that defendant chose to exercise his right to remain silent and waived his right to counsel deprived the defendant of his right to remain silent, his right to counsel, and his right to due process of law.

Officer Rivelle testified in pertinent part as follows:

DIRECT EXAMINATION By District Attorney:

I know the defendant, Larry Darnell Williams. I talked to him on or about June 11, 1979. I advised him of his rights as to self-incrimination. His rights were advised to him — his constitutional rights. He appeared to understand those rights. After I read him his rights, I told him I wanted to talk to him about a robbery and a shooting that happened in Gastonia on June 3, 1979, in the early morning hours.

Q. Now, what, if anything, did Mr. Williams say to you when you made that statement to him?

MR. CLONINGER: OBJECTION.

COURT: OBJECTION OVERRULED.

He stated that he didn't know anything about any robbery or homicide. That he didn't do capital crimes. When I asked him whether he was in Gastonia the 3rd of June, in the early morning hours, he told me that he'd been in Charlotte at that time with Linda Massey and a fourteen year old boy and they were smoking reefers and drinking wine.

Q. And what else was said — did you say to him or did he say to you after that?

A. He said he didn't rob or kill anybody and that he wanted to talk to a lawyer.

Q. And what, if anything did you do when he requested the presence of a lawyer?

A. There was no more questioning.

Defendant contends that the admission of the answers to the last two questions violated his right to remain silent and his right to counsel, citing the rules of *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed. 2d 694 (1966), and *Doyle v. Ohio*, 426 U.S. 610, 96 S.Ct. 2240, 49 L.Ed. 2d 91 (1976).

*Doyle* concerns the use of defendant's silence after *Miranda* warnings for impeachment purposes. The testimony given here was during the State's case-in-chief. Thus, the thrust of the de-

fendant's argument is based on a paragraph from footnote number 37 of the *Miranda* opinion:

> In accord with our decision today, it is impermissible to penalize an individual for exercising his Fifth Amendment privilege when he is under police custodial interrogation. The prosecutor may not, therefore, use at trial the fact that he stood mute or claimed his privilege in the face of accusation.

This Court has often recognized that it is impermissible to use the accused's silence in the face of an accusation to imply guilt. *See State v. McCall*, 286 N.C. 472, 212 S.E. 2d 132 (1975); *State v. Caster*, 285 N.C. 286, 204 S.E. 2d 848 (1974). However, that rules does not apply here. When informed of the topic which the police officer wanted to discuss, the defendant chose not to remain silent. He emphatically denied his guilt, and when finished with his denial, said he wanted to talk to a lawyer; thus the officer, as required by *Miranda*, did not question him further. There was no specific incriminating accusation leveled at the defendant at the time he asserted his rights which defendant, by his silence, might be said to have admitted. *See State v. Love*, 296 N.C. 194, 250 S.E. 2d 220 (1978). Compare *State v. McCall*, 286 N.C. 472, 212 S.E. 2d 132, wherein, after the officer advised the defendant that he had a warrant for his arrest for the killing of Mr. and Mrs. Hice and asked him why he killed them, defendant immediately asserted his right to remain silent.

It is apparent from the reading of this testimony that the State did not use the defendant's request for an attorney to infer guilt. The trial court conducted a *voir dire* hearing and concluded that the defendant had been fully advised of his *Miranda* rights and had knowingly and intelligently waived them and voluntarily made the statements to which the officer testified. Thus, they were admissible against him at trial. These assignments of error are overruled.

[8] In Assignments of Error Nos. 36 and 49, defendant argues that he was prejudiced by the prosecutor's improper comments on his failure to testify or offer evidence to contradict the State's evidence; that the court's instructions did not cure the error; and that the court erred further in denying defendant's motion for appropriate relief on this basis.

The prosecution is privileged, when appropriate, to argue that the State's evidence is uncontradicted, and such argument may not be held improper as a comment upon the defendant's failure to testify. *State v. Smith*, 290 N.C. 148, 226 S.E. 2d 10, *cert. denied*, 429 U.S. 932, 97 S.Ct. 339, 50 L.Ed. 2d 301 (1976). Any contradictions existing could have been shown by the testimony of others or by cross-examination of the State's witnesses themselves. Thus the prosecutor's arguments concerning lack of cross-examination or rebuttal evidence to contradict the State's case are not improper.

When the prosecutor argued that the jury had "neither heard by cross-examination or direct evidence on behalf of Mr. Williams that he was not there," the court immediately sustained defense counsel's objection and instructed the jurors that they would "not consider any reference about Mr. Williams refuting anything." The court later instructed the jury that defendant's decision not to testify created no presumption against him and was not to influence their decision in any way.

Ordinarily a prosecutor's reference to the failure of the defendant to testify or to offer evidence in his defense is cured by the trial court's promptly instructing the jury not to consider it. *State v. Sparrow*, 276 N.C. 499, 173 S.E. 2d 897 (1970); *State v. Lindsay*, 278 N.C. 293, 179 S.E. 2d 364 (1971). The defendant's Memorandum of Additional Authority cites *State v. Britt*, 288 N.C. 699, 220 S.E. 2d 283 (1975), for the premise that a curative instruction by the judge does not always cure highly improper statements made by a prosecutor during closing arguments or improper cross-examination by a prosecutor. While we agree with this premise, we point out that the improper comment in this case does not compare with the highly improper cross-examination and comments by the prosecutor in *Britt*. The court's instructions in this case cured any error in the prosecutor's comments.

Further, defense counsel did not object at trial to all of the comments which are assigned as error. Unless the improper argument was so prejudicial that no instruction by the court could have removed it from the minds of the jury had an objection been seasonably made, an objection to the argument must be made before the verdict in order to preserve the error. *State v. Coffey*, 289 N.C. 431, 222 S.E. 2d 217 (1976).

Assignments of Error Nos. 36 and 49 are overruled.

**[9]**    The defendant assigns as error (Assignments Nos. 25, 37, 38, 68, and 69) the trial court's failure to instruct the jury completely concerning the plea bargains of Linda Massey and Darryl Brawley. The defendant contends that since these witnesses' plea agreements provided that their ten-year sentences for accessory after the fact to the murder of Eric Joines would run concurrently with the ten-year sentences for accessory after the fact to the Concord murder, their effect was to provide a grant of immunity in this case and thus the judge should have informed the jury of their immunity pursuant to G.S. § 15A-1052.[4] This contention is without merit.

Neither Linda Massey nor Darryl Brawley were granted immunity in this case. Their agreement was to plead guilty to accessory after the fact to the murder of Eric Joines for a sentence of ten years to run concurrently with their sentences in the Concord murder.

The applicable statute here is G.S. § 15A-1054:

> *Charge reductions or sentence concessions in consideration of truthful testimony.* — (a) Whether or not a grant of immunity is conferred under this Article, a prosecutor, when

---

4. § 15A-1052. *Grant of immunity in court proceedings.* — (a) When the testimony or other information is to be presented to a court of the trial division of the General Court of Justice, the order to the witness to testify or produce other information must be issued by a superior court judge, upon application of the district attorney:

(1) Be in writing and filed with the permanent records of the case; or

(2) If orally made in open court, recorded and transcribed and made a part of the permanent records of the case.

(b) The application may be made whenever, in the judgment of the district attorney, the witness has asserted or is likely to assert his privilege against self-incrimination and his testimony or other information is or will be necessary to the public interest. Before making application to the judge, the district attorney must inform the Attorney General, or a deputy or assistant attorney general designated by him, of the circumstances and his intent to make an application.

(c) In a jury trial the judge must inform the jury of the grant of immunity and the order to testify prior to the testimony of the witness under the grant of immunity. During the charge to the jury, the judge must instruct the jury as in the case of interested witnesses.

the interest of justice requires, may exercise his discretion not to try any suspect for offenses believed to have been committed within the judicial district, to agree to charge reductions, or to agree to recommend sentence concessions, upon the understanding or agreement that the suspect will provide truthful testimony in one or more criminal proceedings.

(b) Recommendations as to sentence concessions must be made to the trial judge by the prosecutor in accordance with the provisions of Article 58 of this Chapter, Procedure Relating to Guilty Pleas in Superior Court.

(c) When a prosecutor enters into any arrangement authorized by this section, written notice fully disclosing the terms of the arrangement must be provided to defense counsel, or to the defendant if not represented by counsel, against whom such testimony is to be offered, a reasonable time prior to any proceeding in which the person with whom the arrangement is made is expected to testify. Upon motion of the defendant or his counsel on grounds of surprise or for other good cause or when the interests of justice require, the Court must grant a recess.

This statute, unlike G.S. § 15A-1052, contains no requirement that the judge inform the jury of any agreement concerning charge reduction or sentence consideration.

The defense had the right and the opportunity both to cross-examine the witnesses about their arrangements and to argue to the jury with respect to the impact of the arrangements upon their credibility. *See* G.S. § 15A-1055. Indeed Mr. Brawley was cross-examined concerning his arrangement (Record at 124), and defense counsel in his argument to the jury repeatedly reminded the jury of both the witnesses' bargains:

[T]he two individuals that have accused the defendant in this case, as I argued and contended to you before, are the two most interested people in the outcome of this case, next to the defendant over here. The two people who have gained the most from this trial.

. . . We told you that the heart of this case rested in the testimony of the accomplices, and throughout this trial, I con-

sider it to be one of the most amazing things I've ever seen that we have not heard or seen, to my way of thinking, one shred of evidence—not one shred of evidence that supports or lends credibility to these two people—the two people I've told you under the law fall in the category of the most untrustworthy kind of witnesses you can offer, and that is what is known as accomplices—an accomplice's testimony, and I will go into that later.

.  .  .  .

. . . [Linda Massey and Darryl Brawley] are currently charged with armed robbery and murder although they are going to be permitted to plead to something much less.

.  .  .  .

. . . [T]he more severe the penalty, the more likely, I argue and contend to you, that accomplice testimony is liable to be false.

It is human nature of the basest form for people to try to shun responsibility for criminal and immoral acts on other people. It is a natural tendency in all of us, and how much more natural and how much more probable when the false testimony or the testimony which we argue and contend to you is false is given by people who face a possible death sentence or possibly two life sentences and who in exchange for their testimony are able to receive a maximum sentence of ten years and I argue and contend to you that in at least one case, the possibility of release much sooner than that—much sooner.

.  .  .  .

Mrs. Massey has gotten the best of both worlds, ladies and gentlemen. She got her deal from the State on the one hand, and she didn't have to directly accuse anybody of anything. The difference between Brawley and Massey, I think, is that Brawley really enjoys what he's doing up there, and Mrs. Massey doesn't. The one thing that they have in common is that both of them were facing death or two life sentences, and now, they are facing a maximum of ten years. Her testimony is preposterous—absolutely preposterous.

. . . .

. . . [Darryl Brawley] has been given the deal of a lifetime, as I've pointed out to you.

In addition, the State entered into evidence the following stipulation:

That Linda Massey was charged in Gaston County with murder in the first degree and armed robbery and that the State of North Carolina agreed with Linda Massey that in exchange for her truthful testimony that the State would allow her to plead guilty to accessory after the fact of murder and that she receive a sentence of ten years and that this sentence would run concurrent with any other sentence that she might now be serving.

During closing arguments, the State too reminded the jury of the agreements made with Massey and Brawley. Moreover, during the guilt determination phase, the judge instructed the jury that:

Each of these witnesses has testified under an agreement with the prosecutor for a charge reduction in exchange for that witness' testimony. I instruct you that if you find that either of these witnesses testified in whole or in part for this reason it is your duty to scrutinize that witness' testimony with great care and caution in deciding whether or not to believe him. If after doing so you believe the testimony in whole or in part, you should then treat what you believe the same as any other believable evidence.

And there is evidence which tends to show that these witnesses may have been accomplices in the commission of the crimes charged in these cases. An accomplice may actually take part in acts necessary to accomplish a crime or may help or encourage another in a crime either before or during its commission. An accomplice is considered by the law to have an interest in the outcome of the case.

If you find that either of these witnesses was an accomplice, you should examine every part of that witness' testimony with the greatest care and caution. If after doing so you believe the witness' testimony in whole or in part, you should treat what you believe the same as any other believable evidence.

Later, during the sentencing phase, he again instructed the jury concerning the witnesses' arrangements.

The fact that these witnesses had made arrangements for charge reductions in exchange for their testimony was clearly before the jury. Assignments of Error Nos. 25, 37, 38, 68, and 69 are overruled.

III.  SENTENCING

[10]  In Assignments of Error Nos. 35, 40, 47, and 48, the defendant argues that the judgment and sentence for the felony murder of Eric Joines deprived him of his right to be free from double jeopardy, violated the rules of *res judicata* and collateral estoppel, constituted an unlawful multiple use of aggravating circumstances, and amounted to cruel and unusual punishment. Thus, the defendant contends that the trial court erred in denying his motions to dismiss the charges against him and to strike the aggravating circumstance of the Concord robbery-murder, in denying his motion for a directed verdict of life imprisonment at the end of the State's case and instead sentencing him to death, and in precluding the defendant from presenting certain evidence which he sought to introduce at the sentencing phase of the trial.

The trial judge submitted to the sentencing jury in this case the aggravating circumstance that the murder of Eric Joines was part of a course of conduct in which the defendant engaged and which included the commission by the defendant of other crimes of violence against another person, i.e., the robbery-murder of Susan Verle Pierce in Concord.[5] The jury found the existence of this circumstance, found that it was sufficiently substantial to call for imposition of the death penalty, found that it outweighed the seven mitigating factors they found, and recommended the death penalty. Prior to this trial, the defendant had been convicted of the murder of Mrs. Pierce in Cabarrus County. The murder of Eric Joines was found by the sentencing jury in the Concord robbery-murder case in Cabarrus County as an aggravating circumstance and the defendant received a death sentence for the Cabarrus County murder.[6]

---

5. *See State v. Williams* (I), 304 N.C. 394, 284 S.E. 2d 437.

6. We note that the death sentence has been overturned. See Footnote 2.

The defendant argues that the use of the Gaston County Joines murder as an aggravating circumstance in the punishment phase of the Cabarrus County Pierce murder trial (1) precludes the use of the Pierce murder as an aggravating circumstance in the Joines murder trial and (2) precludes even trying the defendant in Gaston County for the Joines murder. We do not agree. This same argument was advanced and rejected by this Court in *State v. Pinch*, 306 N.C. 1, 31, --- S.E. 2d ---, --- (1982):[7]

> [T]he principle of double jeopardy has not evolved, as defendant argues, to the point that it prevents the prosecution from relying, at the sentencing phase of a capital case, upon a related course of criminal conduct by the defendant as an aggravating factor to enhance the punishment of defendant for another distinct offense, and this is so, irrespective of whether the defendant was also convicted of another capital charge arising out of that very same course of criminal conduct and subjected to separate punishment therefor.

The principle of double jeopardy likewise does not preclude the *trial* of the defendant for the other capital crime. The defendant was not convicted of nor punished for the murder of Joines in the prior trial. The defendant has been convicted and sentenced only once for the murder of Joines and will only once be punished therefor. There exists no prohibition for his trial for the murder of Eric Joines, nor the use of the other murder for which he stands convicted as an aggravating circumstance.

[11] Further, the defendant argues that the court erred in excluding as irrelevant evidence offered by the defendant regarding the lack of any deterrent effect of the imposition of the death penalty, the rehabilitative nature of people who have committed even heinous crimes, and the manner of execution in North Carolina. This contention is without merit, as such evidence is irrelevant. *State v. Taylor*, 304 N.C. 249, 283 S.E. 2d 761 (1981); *State v. Cherry*, 298 N.C. 86, 257 S.E. 2d 551. Assignments Nos. 35, 40, 47 and 48 are overruled.

---

7. In *Pinch* the two murders occurred one immediately following the other at the same location and were joined for trial. Here, the two murders occurred in separate incidents, separate counties, and were separated in time by approximately three hours. While there are these differences, here, as in *Pinch*, the two murders occurred in the same course of conduct.

[12]  In Assignments of Error Nos. 58, 72, 73, 80 and 83, the defendant argues that his sentence of death for felony murder in this case is an excessive and disproportionate penalty constituting cruel and unusual punishment; thus the trial court should have directed a verdict of life imprisonment, declared the death penalty statute unconstitutional, instructed the jury that the death sentence could be imposed only if it found that the defendant personally committed the acts causing death and intended to cause death, and refused to enter a judgment of death.

The constitutionality of our death penalty statute has been repeatedly upheld. *See*, for example, *State v. Hutchins*, 303 N.C. 321, 279 S.E. 2d 788 (1981); *State v. Bush*, 289 N.C. 159, 221 S.E. 2d 333 (1976); *State v. Spaulding*, 288 N.C. 397, 219 S.E. 2d 178 (1975); *State v. Woodson*, 287 N.C. 578, 215 S.E. 2d 607 (1975), *reversed on other grounds*, 428 U.S. 280, 96 S.Ct. 2978, 49 L.Ed. 2d 944 (1976). The specific contention that the imposition of the death penalty for felony murder constitutes cruel and unusual punishment has also been rejected by this Court. *State v. Peplinski*, 290 N.C. 236, 225 S.E. 2d 568 (1975), *cert. denied*, 429 U.S. 932, 97 S.Ct. 339, 50 L.Ed. 2d 301 (1976). This Court has repeatedly upheld the death penalty in felony murder cases. *State v. Williams* (I), 304 N.C. 394, 284 S.E. 2d 437; *State v. Taylor*, 304 N.C. 249, 283 S.E. 2d 761; and *State v. Hutchins*, 303 N.C. 321, 279 S.E. 2d 788.

Just as the Legislature acts within its constitutional power in defining first-degree murder to include felony murder, it is also within its constitutional power to determine that first-degree murder, including felony murder, may be punished by death, providing that the death penalty statute itself is constitutional. *See State v. Wall*, 304 N.C. 609, 286 S.E. 2d 68 (1982). We do not find that the death penalty imposed below amounts to cruel and unusual punishment. These assignments of error are overruled.

[13]  The defendant assigns as error (Assignment No. 50) the court's permitting the prosecutor on cross-examination of S.B.I. Agent B. M. Lee during the sentencing phase to elicit testimony concerning Darryl Brawley's prior inconsistent statements given to Agent Lee. The defendant argues that by this testimony, the State was permitted to impeach its own witness, Darryl Brawley. This is not the case. Darryl Brawley admitted on defendant's

cross-examination in the guilt-innocence phase of the trial that he had changed his story about the robbery-murder several times. During the sentencing phase of the trial, in an attempt to impeach the testimony of Brawley, the defendant called S.B.I. Agent B. M. Lee as a witness. Agent Lee testified that he had a series of interviews with Brawley. The defense questioned him only about the first interview, which was inconsistent with Brawley's trial testimony. The State's cross-examination of Agent Lee elicited the contents of his other interviews of Brawley which corroborated Brawley's testimony that he kept changing his story. Thus, the rule against the State impeaching its own witness has no application here. There was no error in the State's eliciting testimony corroborating Brawley's earlier testimony after the defendant's attempt to impeach his credibility. *See State v. Carter*, 293 N.C. 532, 238 S.E. 2d 493 (1977). Assignment of Error No. 50 is overruled.

[14] The defendant assigns as error (Assignment No. 51) the trial judge's overruling of his objection to certain testimony of Agent Lee during the sentencing proceedings and the court's refusal to permit him to make known the nature of his objection out of the presence of the jury. The defendant contends that the witness Lee's reference to "Polygraphist Mike Humberg" when being cross-examined about Brawley's prior statement was a deliberate attempt to convey to the jury the impression that the statement given by Brawley on 11 June implicating the defendant was confirmed by a polygraph examination. This contention is without merit; it is based on mere speculation. Furthermore, the jury cannot be deemed to have inferred that a polygraph examination was conducted from the one isolated use of the word *polygraphist*. Throughout the rest of his testimony, Agent Lee referred to Mike Humberg as *Mr.* Humberg or *Officer* Humberg. No mention of any polygraph examination was ever made. Counsel may approach the bench only with the judge's permission. Rule 12, North Carolina General Rules of Practice for Superior and District Courts. The court gave counsel ample opportunity to state the basis for his objection, but he failed to do so. Although the objection was overruled, Mr. Humberg was not referred to as "polygraphist" again. There exists no reversible error here. The assignment of error is overruled.

[15] The defendant argues that it was error (Assignments Nos. 45, 79, 85, and 86) for the judge to enter the judgment of death because the death penalty statute, and specifically G.S. § 15A-2000(e)(11), is unconstitutionally vague and because there was insufficient evidence to find beyond a reasonable doubt the existence of the aggravating circumstance submitted in this case.

In the sentencing phase, the State relied on a single aggravating circumstance, that provided in G.S. § 15A-2000(e)(11):

> The murder for which the defendant stands convicted was part of a course of conduct in which the defendant engaged and which included the commission by the defendant of other crimes of violence against another person or persons.

The defendant argues that the term "course of conduct" is vague and indefinite, and that for some of its possible meanings, the Joines killing and the Pierce killing were not part of the same course of conduct.[8] We do not agree.

> Sentencing standards are by necessity somewhat general. While they must be particular enough to afford fair warning to a defendant of the probable penalty which would attach upon a finding of guilt, they must also be general enough to allow the courts to respond to the various mutations of conduct which society has judged to warrant the application of the criminal sanction. See Gregg v. Georgia, 428 U.S. at 194-195, 49 L.Ed. 2d at 886-887, 96 S.Ct. at 2935. While the questions which these sentencing standards require juries to answer are difficult, they do not require the jury to do substantially more than is ordinarily required of a factfinder in any lawsuit. See Proffitt v. Florida, 428 U.S. at 257-258, 49 L.Ed. 2d at 926, 96 S.Ct. at 2969. The issues which are posed to a jury at the sentencing phase of North Carolina's bifurcated proceeding have a common sense core of meaning. Jurors who are sitting in a criminal trial ought to

---

8. The defendant also argues that this aggravating circumstance requires that the defendant had committed other crimes of violence against another person or persons in the course of conduct in order for this aggravating circumstance to be submitted to the jury. He argues that since here there was only a single additional crime, the aggravating circumstance should not have been submitted. We note that there were two additional crimes committed in this course of conduct, armed robbery and murder.

be capable of understanding them and applying them when they are given appropriate instructions by the trial court judge. *See Jurek v. Texas*, 428 U.S. at 279, 49 L.Ed. 2d at 939, 96 S.Ct. at 2959 (White, J., concurring).

*State v. Barfield*, 298 N.C. 306, 353, 259 S.E. 2d 510, 543 (1979), *cert. denied*, 448 U.S. 907, 100 S.Ct. 3050, 65 L.Ed. 2d 1137, *rehearing denied*, 448 U.S. 918, 101 S.Ct. 41, 65 L.Ed. 2d 1181 (1980), ---- U.S. ----, 102 S.Ct. 693, 70 L.Ed. 2d 261 (1981). We are not persuaded that the term "course of conduct" is unconstitutionally vague or without definition. This Court has rejected such arguments before. *State v. Rook*, 304 N.C. 201, 283 S.E. 2d 732 (1981); *State v. Barfield*, 298 N.C. 306, 259 S.E. 2d 510. The trial judge instructed the jury concerning the aggravating factor as follows:

Now, ladies and gentlemen, the murder of Eric Joines by the defendant was part of such a course of conduct if it and other crimes of violence were parts of a pattern of intentional acts directed toward the perpetration of such crimes of violence which establishes that there existed in the mind of the defendant a plan, scheme, or design involving both the murder of Eric Joines and other crimes of violence.

In order for you to answer this issue yes, the State must satisfy you beyond a reasonable doubt of these things:

First, that the defendant himself or acting in concert with another person took or attempted to take money from the person or presence of Mrs. Pearce at the Seven-Eleven store.

As I instructed you at the end of the first phase of this trial, it is not necessary for a person himself to do all the acts required to constitute a crime in order for him to be guilty of that offense. If two or more persons act together with a common purpose to commit a crime, each is held responsible for the acts of the other.

Secondly, the State must satisfy you beyond a reasonable doubt that the defendant himself or acting in concert with another person carried away the money or attempted to do so.

Third, that Mrs. Pearce did not voluntarily consent to the taking and carrying away of the property.

Fourth, that at the time of the taking or of the attempt to take the property the defendant himself intended to deprive Mrs. Pearce of its use permanently.

Fifth, that the defendant knew that he was not entitled to take the property.

Sixth, that the defendant himself or acting in concert with another person had a firearm in his possession at the time the property was taken or attempted to be taken.

Seven, that the defendant himself or acting in concert with some other person obtained or attempted to obtain the property by endangering or threatening the life of Mrs. Pearce with the firearm.

Eight, that while committing or attempting to commit such robbery the defendant himself of acting in concert with some other person shot Mrs. Pearce with a firearm.

Nine, that the shooting was a proximate cause of Mrs. Pearce's death.

A proximate cause is a cause without which her death would not have occurred.

Ten, that the robbery and killing of Mrs. Pearce were part of a pattern or plan of the same or similar type intentional acts as those involved in the murder of Eric Joines.

Eleven, that there existed in the mind of the defendant a plan, scheme, or design involving the robbery and killing of Eric Joines and the robbery and killing of Mrs. Pearce.

The defendant's behavior clearly comes within the conduct intended by the Legislature to be covered. Assignments numbered 45, 79, 85 and 86 are overruled.

[16]   In Assignments of Error Nos. 60 and 78, defendant argues that the court erred in refusing to submit to the jury as a specified mitigating circumstance the fact that two accomplices received a plea bargain whereby the maximum punishment for their involvement would be limited to ten years in prison. While

State v. Williams

recognizing that the Court has rejected the same contention in *State v. Irwin*, 304 N.C. 93, 282 S.E. 2d 439 (1981), the defendant requests that we reconsider our holding there. We reaffirm that holding. The fact that the defendant's accomplices received a lesser sentence is not an extenuating circumstance. It does not reduce the moral culpability of the killing nor make it less deserving of the penalty of death than other first-degree murders. *See State v. Hutchins*, 303 N.C. 321, 279 S.E. 2d 788. The accomplices' punishment is not an aspect of the defendant's character or record nor a mitigating circumstance of the particular offense. *See Lockett v. Ohio*, 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed. 2d 973 (1978). It bears no relevance to these factors, and thus there was no error in the judge's refusal to submit it to the jury. Moreover, the fact of the accomplices' bargains were before the jury, and had they deemed it a mitigating circumstance, they could have so considered it under the catch-all "any other circumstance . . . ." G.S. § 15A-2000(f)(9). These assignments are overruled.

[17] In Assignment of Error No. 59, the defendant argues that the court erred in refusing to submit to the jury the defendant's use of alcohol on the night of the crime as a mitigating circumstance. There was no expert psychiatric or other evidence introduced to show that his capacity to appreciate the criminality of his conduct was impaired by alcohol, and therefore the trial court was correct in not submitting the mitigating factor in G.S. § 15A-2000(f)(6).[9] Yet, defendant contends that the fact that he drank some alcohol on the evening of the crime should have been submitted for the jury's consideration as a general mitigating circumstance. We do not agree. We do not believe that the Legislature intended the mere ingestion of alcohol to be a mitigating circumstance. "If this were true, every murderer, conceivably, would consume strong drink before taking his victim's life." *State v. Goodman*, 298 N.C. 1, 32, 257 S.E. 2d 569, 589 (1979). There was no contention that the defendant was intoxicated nor that his capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was impaired. This assignment must be overruled.

---

9. G.S. § 15A-2000(f)(6): The capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was impaired.

**[18]** In Assignments of Error Nos. 74 and 75, the defendant argues that placing the burden on him to prove the mitigating circumstances by a preponderance of the evidence and failing to require the State to prove the absence of the existence of mitigating circumstances beyond a reasonable doubt is error. While recognizing that this Court has decided this issue against him, the defendant requests that we reconsider our position. We reaffirm our position and these assignments are overruled. *State v. Pinch*, 306 N.C. 1, --- S.E. 2d ---; *State v. Barfield*, 298 N.C. 306, 259 S.E. 2d 510; *State v. Johnson*, 298 N.C. 47, 257 S.E. 2d 597 (1979).

In Assignments of Error Nos. 81 and 82, defendant requests that we re-examine our prior rulings concerning the constitutionality of the death penalty and vacate the sentence imposed in this case on the grounds that the death penalty is applied in a discretionary and discriminatory manner. We adhere to our prior rulings, and these assignments of error are overruled. *State v. Williams* (I), 304 N.C. 394, 284 S.E. 2d 437; *State v. Barfield*, 298 N.C. 306, 259 S.E. 2d 510.

**[19]** In Assignments of Error Nos. 63, 70, and 71,[10] the defendant argues, as did the defendant in *State v. Pinch*, that it was error for the prosecutor to argue and the court to instruct the jury that if they found beyond a reasonable doubt that the aggravating circumstance existed, that it was substantially sufficient to call for the imposition of the death penalty, and that it outweighed any mitigating circumstance or circumstances found, then it would be their *duty* to recommend that the defendant be sentenced to death. We note that the court also instructed that if the jury did not find beyond a reasonable doubt any one or more of these, it would be their duty to recommend life imprisonment. As this Court pointed out in *Pinch*, this argument by the prosecutor and this instruction by the court are entirely proper. The defendant argues that it withdraws from the jury its final option to recom-

---

10. Assignment of Error No. 71 is that the court failed to instruct the jury that the State had the burden of proving beyond a reasonable doubt that the aggravating circumstance substantially outweighed the mitigating circumstances to such an extent as to call for the death penalty. This argument was not advanced in the brief and is therefore deemed abandoned. We note, however, that the judge did so instruct the jury.

mend life imprisonment notwithstanding its earlier findings. As we stated in *Pinch*:

> The jury had no such option to exercise unbridled discretion and return a sentencing verdict wholly inconsistent with the findings it made pursuant to G.S. 15A-2000(c). The jury may not arbitrarily or capriciously *impose or reject* a sentence of death. Instead, the jury may only exercise guided discretion *in making the underlying findings* required for a recommendation of the death penalty within the 'carefully defined set of statutory criteria that allow them to take into account the nature of the crime and the character of the accused.' *State v. Johnson*, 298 N.C. 47, 63, 257 S.E. 2d 597, 610 (1979); *see State v. Barfield*, 298 N.C. 306, 349-52, 259 S.E. 2d 510, 541-43 (1979), *cert. denied*, 448 U.S. 907, 100 S.Ct. 3050, 65 L.Ed. 2d 1137 (1980).

*State v. Pinch*, 306 N.C. 1, 33, --- S.E. 2d ---, --- (emphases original).

The defendant argues that even if the jury fails to find sufficient mitigating circumstance(s) which outweigh the aggravating circumstance(s) found, it may still, in its discretion, impose a sentence of life imprisonment. We find no authority for that position in G.S. § 15A-2000(e) or elsewhere. In several cases the jury has indeed done just that and returned a recommendation of life imprisonment. *State v. Taylor* (I), 298 N.C. 405, 259 S.E. 2d 502 (1979); *State v. King*, 301 N.C. 186, 270 S.E. 2d 98 (1980). While this was error, it was error favorable to the defendant from which the State could not appeal.

In two other cases wherein the jury found that the aggravating circumstances outweighed the mitigating circumstances but did not recommend a sentence, a life sentence was entered by the trial judge as G.S. § 15A-2000(b) requires him to do. *State v. Easterling*, 300 N.C. 594, 268 S.E. 2d 800 (1980); *State v. Silhan*, 302 N.C. 223, 275 S.E. 2d 450 (1981), on rehearing in Superior Court, Columbus County (Case No. 79CRS1943).

G.S. § 15A-2000(b) requires the jury to deliberate and render a sentence recommendation "based upon" two considerations: (1) whether sufficient aggravating circumstances exist and (2) whether sufficient mitigating circumstances exist which outweigh

the aggravating circumstances found. The statute specifically requires that the jury sentence recommendation be *"based on these considerations"* — not unbridled discretion. G.S. § 15A-2000(b)(3). This specific mandate is clear — it requires no interpretation.

The trial judge correctly instructed the jury on this point. Indeed, to instruct the jury otherwise would permit it to disregard the procedure established by the Legislature and impose the sentence of death with unbridled discretion contrary to the dictates of *Furman v. Georgia*, 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed. 2d 346 (1972), and its successor cases. *See State v. Pinch*, 306 N.C. 1, --- S.E. 2d ---; *State v. Goodman*, 298 N.C. 1, 257 S.E. 2d 569. These assignments are overruled.

[20] Finally, the defendant argues that the infliction of the death penalty upon him would be an excessive and disproportionate penalty. This Court is required to review the sentence of death to determine whether it is "excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant." G.S. § 15A-2000(d)(2). We do not agree that the imposition of the death penalty in this case would amount to excessive or disproportionate punishment. The facts of this case show that the defendant deliberately sought out not one, but two lone employees of business establishments in relatively isolated areas during the early morning hours when no one was around, robbed them at gunpoint, and then shot them to death at very close range with a shotgun before fleeing with the money. This was a brutal murder. We cannot say that the sentence of death imposed here is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant. *See State v. Pinch*, 306 N.C. 1, --- S.E. 2d ---; *State v. Taylor*, 304 N.C. 249, 283 S.E. 2d 761; *State v. Rook*, 304 N.C. 201, 283 S.E. 2d 732 (1981); *State v. Hutchins*, 303 N.C. 321, 279 S.E. 2d 788; *State v. Martin*, 303 N.C. 246, 278 S.E. 2d 214, *cert. denied*, --- U.S. ---, 102 S.Ct. 431, 70 L.Ed. 2d 240 (1981); *State v. Barfield*, 298 N.C. 306, 259 S.E. 2d 510.

We have carefully examined defendant's other assignments of error not specifically treated herein. We find them to be without merit and they are overruled.

The record clearly supports the jury's guilty verdict and its finding of the aggravating circumstance upon which the sentenc-

ing court based its sentence of death. There is no evidence that the sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary factor; nor is the sentence of death excessive or disproportionate. The defendant's conviction and the sentence imposed must be affirmed.

No error.

Justice EXUM dissenting as to sentence.

For the reasons stated in Part I of my dissenting opinion in *State v. Pinch*, 306 N.C. 1, 38, 292 S.E. 2d 203, 230 (1982), I believe it was prejudicial error for the trial judge to instruct the jury that it had a duty to recommend the death sentence if it answered certain issues favorably to the state.

For the reasons stated in Part II of my dissenting opinion in *State v. Pinch, supra,* I conclude that prospective juror Melton was improperly excused for cause in violation of *Witherspoon v. Illinois,* 391 U.S. 510 (1968).

Therefore I vote to vacate the death sentence and to remand for a new sentencing hearing. I concur in the majority's conclusion that no prejudicial error occurred in the guilt phase of the case.